**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**AMSTER & CO., formerly known as Lafer Amster & Co., Arnold Marvin Amster, Barry Stuart Lafer, and Joel Richard Packer, Defendant.**

No. 88 Civ. 8587 (CSH).

United States District Court, S.D. New York.

May 14, 1991.

As Amended May 21, 1991.

See also 126 F.R.D. 28.

Lawrence Iason, Regional Admin'r (Carmen J. Lawrence, Robert B. Blackburn, Christopher S. Petito, James J. Tyne, Henry Klehm III, of counsel), New York City, for S.E.C.

Shea & Gould (Milton S. Gould, Frank C. Razzano, Peter C. Neger, Ira Daniel Tokayer, of counsel), New York City, for Arnold M. Amster and Amster & Co.

Buchwald & Kaufman (Don D. Buchwald, James M. Kenelly, of counsel), New York City, for Joel Richard Packer.

Hellring Lindeman Goldstein Siegal Stern & Greenberg (Herbert J. Stern, of counsel), Newark, N.J., for Barry Stuart Lafer.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this civil action plaintiff Securities and Exchange Commission ("SEC") sues all defendants for alleged violations of section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and accompanying regulations; and all defendants but one for alleged violation of section 10(b) of the Act, 15 U.S.C. § 78j(b), and its regulations. Defendants move under Rule 12(b)(6), Fed. R.Civ.P., to dismiss the complaint for failure to state a claim, or in the alternative for summary judgment under Rule 56(c). Because all parties rely upon materials outside the pleadings, I treat defendants' motion as one for summary judgment.

### Background

Defendant Amster & Co. is a New York limited partnership and the successor partnership of Lafer, Amster & Co. ("LACO"). The principal business of both Amster & Co. and LACO was and is risk arbitrage investing.

Defendant Arnold Marvin Amster was and is a general partner and the senior managing partner of Amster & Co.

Defendant Barry Stuart Lafer was at the relevant times a general and managing partner of Amster & Co. Lafer left Amster & Co. and founded his own investment firm in the summer of 1988.

Defendant Joel Richard Packer was at the relevant times a general partner of Amster & Co. Packer left Amster & Co. in approximately June 1988.

Risk arbitrageurs do not purchase the shares of companies for long-term invest-

ment purposes. Rather, they purchase shares in the expectation or hope that some anticipated event occurring in the short term will drive the price of the shares up, setting the stage for resale and profit. Corporate mergers may have this happy effect; so may take-overs, friendly or hostile; so may the liquidation of the company. If arbitrageurs have reason to believe that a company will soon be liquidated, they are motivated to purchase its shares if their calculations indicate that the breakup value per share will exceed the then existing market price.

This last-described investment strategy brought a company called Graphic Scanning Corp. ("Graphic") to the attention of LACO in August 1984. At that time Graphic owned and operated radio paging and cellular telephone franchises throughout the United States. In August 1984 Graphic publicly announced a liquidation. LACO, anticipating the liquidation to occur within a year and a half of the announcement, began purchasing shares of Graphic. LACO made these investments on its own account, and also indirectly on behalf of its limited partners, the largest of which was the General Electric Pension Fund.

Eventually LACO's purchases of Graphic shares amounted to a 5% interest in Graphic. LACO was therefore required to comply with the disclosure provisions of § 13(d) of the Securities Exchange Act. LACO's Schedule 13(D), dated August 18, 1985, described the purpose of its transactions in Graphic in part as follows:

> Each of LACO and the Other Filing Persons has acquired the shares of Common Stock which he owns (see Item 5 below) for the purpose of making an investment in the Company and not with the present intention of acquiring control of the Company's business.
> The shares of the Common Stock reported as being owned by LACO were acquired in connection with arbitrage and other activities in the ordinary course of LACO's business. Certain general partners and employees of LACO have had telephone conversations with the Company. LACO does not believe that it re-

ceived any material information during those conversations which had not then been publicly disseminated by the Company.

> Each of LACO and the Other Filing Persons supports the Company's public announcement on September 24, 1984 and February 15, 1985 regarding its intention to develop a plan of asset distribution to its stockholders complying with Section 337 of the Internal Revenue Code. LACO presently intends to continue to purchase shares of Common Stock in the over-the-counter market or in private transactions if appropriate opportunities to do so are available, on such terms and at such times as it considers desirable. If the Company abandons its intention referred to above, either by public announcement or through of a course of action or inaction which leads LACO to believe that a distribution of the Company's assets to its stockholders will not be effected within a reasonable period of time, LACO intends to review its position and take any such action as it deems appropriate at the time.

On January 28, 1989, Graphic filed with the SEC a Form S-1 Registration statement in which Graphic indicated for the first time that the announced liquidation might not go forward. The Form S-1 stated in part: "Although the Company is currently considering the sale of all of its operations and assets, if appropriate offers are not received for all of the assets, it is possible that the Board may determine to sell only portions of the Company's operations and assets." The form also indicated that the Graphic Board was negotiating with the Company's founder and chairman, Barry Yampol, with respect to claims Yampol had against Graphic, one possible resolution being the transfer to Yampol of "certain cellular radio telephone properties and other assets of the Company."

These statements in Graphic's Form S-1 came as unwelcome news to LACO, which had invested in Graphic in anticipation of liquidation. On January 31, 1986, Lafer telephoned Graphic's general counsel, Jonathan Dodge, and asked what the Form S-1

meant. Lafer asked Dodge if the tax reform bill pending in Congress could impact upon the Section 337 liquidation originally contemplated by Graphic. Dodge replied that the tax bill could alter the liquidation plan, and added, in the context of Graphic's registration statement, that the use of the proceeds would be partially applied to assets acquisition. Lafer told Dodge that LACO and those associated with it were "unhappy shareholders."

There then ensued a series of meetings involving LACO officers, representatives of other Graphic shareholders, and various attorneys. It is not necessary for purposes of supplying the background of this litigation to describe those meetings and related documents in detail. They are dealt with in the discussion which follows.

For purposes of background, it is sufficient to say that on March 3, 1986, LACO and others affiliated with it filed Amendment 7 to their Schedule 13D with an effective date of February 28, 1986. Amendment 7 stated that defendants had decided to join a group to engage in a proxy contest to obtain control of Graphic. Amendment 7 had been preceded by Amendment 5, filed on or about February 10, 1986, and Amendment 6, filed on or about February 18. Amendment 5 made no changes in the description of defendants' purpose of their transactions in Graphic. Amendment 6 stated that the defendants had begun to consider "on a preliminary basis" waging a proxy contest for control of Graphic as the result of information disclosed in a Form 8–K filed by Graphic on February 7, 1986.

That Form 8–K announced, among other developments, an agreement in principle settling Yampol's claims, pursuant to which Yampol would receive Graphic's interests in cellular radio telephone services in Boston and Worcester as well as an option to purchase a minority interest in two Graphic subsidiaries, in return for certain payments, a release of Yampol's claims against Graphic, and the retirement of Yampol. Amster regarded the Yampol settlement, as described in Graphic's Form 8–K, as a theft of corporate assets.

Between February 4 and 14, 1986, LACO continued to purchase Graphic securities. Individual defendants Lafer and Amster also made purchases. Specifically, on February 3, 1986 LACO bought $1.7 million face value of Graphic convertible debentures at a cost of $1,466,250. On February 4, LACO purchased a total of 17,500 shares of Graphic common stock. On February 6 LACO purchased another 87,500 shares, and on February 7 an additional 100,000 shares, for a total of 205,000 shares at a total cost of $1,410,000. On February 14, defendants Lafer and Amster each purchased 25,000 shares of Graphic at a total cost (for 50,000 shares) of $352,000.

After conducting an administrative investigation, including the taking of depositions ex parte, the SEC filed this complaint seeking injunctive relief and an order of disgorgement. The complaint asserts two claims. First, all defendants are charged with violating § 13(d) and its accompanying rules. Specifically, defendants are charged with failure to file timely and accurate amendments to the Schedule 13D. In that regard, the complaint alleges that "[n]o later than on or about February 3, 1986, defendants singly and in concert changed the purpose of their investment and no longer held their Graphic stock for investment purposes only." Complaint, ¶ 13. The complaint further alleges that "[b]eginning no later than February 3, 1986, each of the defendants attended meetings or participated in discussions during which they proposed and solicited support for a proxy contest to take control of Graphic." ¶ 14.

Amendment 5 to the Schedule 13D is alleged to violate § 13(d) because it "failed to disclose that the defendants were considering waging a proxy contest for control of Graphic," an omission which the SEC alleges rendered Amendment 5 false and misleading. ¶ 15. Amendment 6, which stated that defendants had begun to consider "on a preliminary basis" waging a proxy contest for control of Graphic, is alleged to be false and misleading in misrepresenting the date when defendants began to consider a proxy contest; the basis for their change of purpose; and the nature and extent of their

consideration of a proxy fight for control of Graphic. ¶ 17. Amendment 7, in which defendants declared their decision to enter a proxy contest, is alleged to be false and misleading in its suggestion "that defendants did not decide to go forward with a proxy fight until February 28, 1986, when in fact they had reached that decision earlier." ¶ 19.

The SEC's second claim, alleged against all defendants except Packer, realleges and incorporates by reference the complaint's prior allegations. ¶ 29. The complaint then alleges violation of § 10(b) and Rule 10b–5 in consequence of the acts and conduct previously alleged.

The filing of the complaint was preceded by an extensive administrative investigation. After filing of the complaint, the parties have conducted discovery including a number of depositions. All defendants now move for summary judgment dismissing the complaint.

### Discussion
### The Standards for Summary Judgment

Rule 56(c) provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Rule 56(e) provides in part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the adverse party.

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Although the movant initially bears the burden of showing that there are no genuine issues of material fact, once such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Summary judgment is warranted where, "after adequate time for discovery ... [the nonmoving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To establish a genuine issue of fact, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"; it must come forward with "specific facts showing that there is *a genuine issue for trial.*" *Matsushita Electric Industry Corp., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1985) (quoting Rule 56(e); emphasis is the Court's). Absent such a showing, summary judgment is appropriate since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552–53. The standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedures 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but

one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

*The Governing Principles of Law*

The SEC's first claim alleges violations of § 13(d) of the 1934 Act, a section of the statute popularly known as the Williams Act. The Williams Act requires a group that has acquired, directly or indirectly, beneficial ownership of more than 5% of a class of a registered equity security to file a statement with the SEC disclosing, *inter alia,* the identity of its members and the purpose of its acquisition. The Second Circuit considered the legislative history of § 13(d) in *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). The court of appeals observed in *Milstein* that prior to enactment of the Williams Act, individuals seeking control of a corporation through a proxy contest were required to comply with § 14(a) of the 1934 Act and the SEC's proxy rules, and those making stock tender offers were required to comply with other provision of the statute; but "before the enactment of the Williams Act there were no provisions regulating cash tender offers or other techniques of securing corporate control." Turning to the legislative history, the Second Circuit said in *Milstein:*

> According to the committee reports: "The [Williams Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicity held companies." S.Rep. No. 550 at 4; H.R.Rep. 1711 at 4, [1968] U.S.Code Cong. & Admin.News p. 2814.
>
> Specifically, we were told, "the purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time." S.Rep. No. 550 at 7; H.R.Rep. No. 1711 at 8, [1968] U.S.Code Cong. &

Admin.News p. 2818. Otherwise, investors cannot assess the potential for changes in corporate control and adequately evaluate the company's worth. *See generally* Comment, section 13(d); and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853, 854–55, 858, 865–66 (1971). (footnote omitted).

The provision particularly applicable to the case at bar is found in § 13(d)(1)(C), which, "if the purpose of the purchases or prospected purchases is to acquire control of the business of the issuer of the securities," requires the person holding more than 5% of the shares to disclose

> any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure …

Under the statutory scheme, these specific disclosures are required only if the purchaser's "purpose" is "to acquire control" of the insurer's business. In *Milstein,* the Second Circuit summarized § 13(d)(1)(C) by saying that it "requires the person filing to disclose any intention to acquire control." 453 F.2d at 717. Thus *purpose* is equated with *intention.*

The SEC has defined the term "control" in Rule 12b–2(f), 17 C.F.R. § 240.12b–2(f), made applicable to Schedule 13D filings by 17 C.F.R. § 240.12b–1. That rule provides:

> The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly of the power to direct or cause the direction of the management and policies of a person, whether the ownership of voting securities, by contract, or otherwise.

The SEC rules require investors falling within § 13(d)'s ambit to make their disclosures on Schedule 13D. *See* 17 C.F.R. § 240.13d–101. Schedule 13D requires disclosure, *inter alia,* of the following:

**Item 4.  Purposes of Transaction**

State the purpose of purposes of the acquisition of securities of the issuer. Describe any plans or proposals which

the reporting persons may have which relate to or would result in:

\* \* \* \* \* \*

(b) An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries;

\* \* \* \* \* \*

(d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number of term of directors or to fill any existing vacancies of the board;

\* \* \* \* \* \*

(j) Any action similar to any of those enumerated above.

The SEC rules also require that "[i]f any material change occurs in the facts set forth in the [Schedule 13D], ... the [filing person] shall promptly file or cause to be filed ... an amendment disclosing such claim." Rule 13d–2(a), 17 C.F.R. § 240.13d–2(a).

It has been said generally of the securities laws that their "disclosure provisions are intended to protect investors and enable them to receive the facts necessary for informed investment decisions." *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 248 (8th Cir.1979). In *Chromalloy*, a case upon which the SEC at bar places particular reliance, the Eighth Circuit went on to say: "However, the objective of full and fair disclosure can be endangered as much by overstating the definiteness of plans as by understating them." *Ibid.* This has always been the rule in the Second Circuit. In *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969), the court of appeals said of disclosure mandated by SEC Rule 14d–1(c) and Schedule 13D: "It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them." The danger inherent in overstating the definiteness of plans is that the overstatement "may cause the offeree or the public investor to rely on them unjustifiably." *Susquehanna Corp. v. Pan American Sulfer*

*Co.*, 423 F.2d 1075, 1085–86 (5th Cir.1970), *cited and quoted* by the Second Circuit in *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 872 (2d Cir.1974). Judge Pollack's careful analysis in *Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F.Supp. 1383, 1387 (S.D.N.Y.1982), deals with the pertinent distinction:

> The applicable rule in the disclosure laws is that disclosure is to be made of all definite plans and there is no requirement to make predictions, for example, of future behavior, *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 872 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); or to disclose tentative plans; *Marshall Field & Company v. Icahn*, 537 F.Supp. 413 (S.D.N.Y.1982); or inchoate plans; *Merrit v. Libby, McNeil & Libby*, 510 F.Supp. 366 (S.D.N.Y.1981). It is sufficient to merely identify those matters not fully determined.

While each case turns on its own facts, the language the Second Circuit uses in explaining its holdings in particular cases is instructive. *Compare Gulf & Western Industries, Inc. v. Great & P. Tea Co., Inc.*, 476 F.2d 687, 696, (2d Cir.1973) ("considerable evidence was adduced at the hearing which indicates that G & W purchased A & P stock not for the purpose of investment but with a view to exercising influence or control," and which "indicates that such intent was present"), and *Gerstle v. Gamble–Skogmo, Inc.* 478 F.2d 1281, 1295 (2d Cir.1973) (approving the district court's findings that "Skogmo intended at least by and probably before July 19, 1963, to sell all the remaining outdoor advertising plants of General immediately after the merger"), with *Missouri Portland Cement Co. v. Cargill, Inc., supra*, at 872 ("But there is no evidence that any such plan was developed, much less adopted, or that the statement in the offer was anything but the truth.").

To recapitulate the analysis thus far:

Under the standards for summary judgment, the SEC as the party opposing the motion come forward with specific facts showing a genuine issue for trial on the

existence of an element essential to the SEC's case and on which the SEC bears the burden of proof.

■ Under the governing law, on its first claim the SEC bears the burden of proving the essential element that defendants failed to disclose in filings required by § 13(d) a definitely formed intention to obtain control of Graphic by means of a proxy contest. To paraphrase Judge Pollack's formulation in *Todd Shipyards*, 547 F.Supp. at 1388, the SEC's burden at trial would be to prove by a preponderance of the credible evidence that at the time of defendants' filing of their Schedule 13D or at least one of its amendments, defendants had a "purpose or plans with respect to [Graphic] or their investment in [Graphic] other than as described in their Schedule 13D" or the amendments.

The SEC would derive from § 13(d) a duty falling upon these defendants to report concerning a proxy contest before deciding to wage one. Its brief at 2 rejects as "plainly wrong" defendants' contention that to prevail the SEC must prove that defendants decided to launch a proxy contest before February 28, 1986. The SEC construes § 13(d) to require the reporting of "any material change in purpose, not just a 'decision' on a particular course of action to effectuate a change." Brief at 2–3. In a phrase that runs like a *leitmotif* throughout its brief, the SEC argues that § 13(d) requires disclosure whenever "the securities purchaser has a perceptible desire to influence substantially the insurer's operations . . ." *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1226 n. 9 (4th Cir. 1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981), *quoting Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 246–47 (8th Cir.1979). The SEC argues that "such a desire was manifested" by the defendants at bar not later than February 3, 1986, when they presented another Graphic shareholder with a scenario for a proxy contest for control of the company. *Id.* at 3.

I consider that incident *infra*, together with the other evidence adduced during the investigation and discovery. However, it is useful to view that evidence through the prism of the governing law. In that regard, I reject the SEC's construction of § 13(d) as applied to the facts of this case. I reject that construction because it is inconsistent with the cases previously cited, and stands upon fragile underpinnings.

The latter point requires some consideration of the facts in *Dan River* and *Chromalloy*. Since the SEC's talismanic phrase comes from *Chromalloy* by way of a footnote in *Dan River*, I begin with *Chromalloy*.

The issue there was whether Sun Chemical Corp. had violated § 13(d) by failing to disclose its purpose with respect to Chromalloy, whose stock Sun was purchasing. The Eighth Circuit affirmed the district court's conclusion that the defendants violated § 13(d) since they failed to disclose that they

"had the intent to control Chromalloy from the beginning" and that "defendants have intended to exert considerable influence over the Board of Directors of Chromalloy, and, through this influence, direct the policies and management of Chromalloy." 611 F.2d at 243 (quoting from district court opinion).

The court of appeals divined that intent through a number of particular steps Sun had taken, *id.* at 246, of which the court said: "Taken together, these facts support the finding that Sun proposes to control Chromalloy through a combination of numbers and influence." *Ibid.* It is in this context that the Eighth Circuit went on to say:

Disclosure of a control purpose may be required when the securities purchaser has a perceptible desire to influence substantially the insurer's operation. *Id.* a[t] 246–47.

In *Dan River*, defendant Unitex Limited, acting through affiliates, began to acquire shares in Dan River, Inc., a textile manufacturer located in Virginia. Unitex, a Hong Kong textile manufacturer, after consultation with Lazard Freres & Company, decided to acquire a substantial equity position in Dan River stock. To finance those purchases, Unitex negotiated with

Wardley Limited, a Hong Kong financial institution. According to the proof, Wardley expressed a willingness to do the financing, "provided that Wardley's could be assured of the fundamental *financial soundness of Unitex's plan."* 624 F.2d at 1218 (emphasis is the Court's). Using bridge financing from Wardley, Unitex and two individuals acquired Dan River shares sufficient in amount to trigger the reporting provisions of § 13(d). Shortly thereafter the individuals sold some shares back to Unitex, while others were disposed of to another party. Unitex discontinued purchases of Dan River stock until it had established a corporate subsidiary, Mannip Limited, in the British Virgin Islands, for the sole purpose of acquiring and holding any future purchases of Dan River stock on Unitex's behalf. Unitex also needed to complete its final financing arrangements with Wardley and its associated bank, The Chartered Bank. With these objectives accomplished, Unitex recommenced purchase of Dan River stock. It received a line of credit in excess of $13 million for this purpose. To secure that loan, Unitex pledged its interests in Mannip and the worth of Unitex itself. In addition, four Unitex directors personally agreed to advance $1 million against the loan and to guarantee individually the remainder.

When the total Unitex-oriented purchases in Dan River again triggered § 13(d), Mannip alone filed a Schedule 13D. That schedule stated in part:

> While Mannip is not solely a passive investor in the Company, neither Mannip nor Unitex has any present intention to seek control of the Company or to propose a merger or similar transaction with the Company. 624 F.2d at 1219.

Dan River sued Unitex and its affiliates, alleging that this statement of purpose was insufficient, and praying for equitable relief. Mannip and Unitex filed an amended schedule 13D, which added some verbiage but said again that "[n]either Mannip nor Unitex presently intends to seek to acquire control of the company ..." Dan River characterized the amended schedule as equally deficient.

The district court dismissed the complaint, apparently under the impression that the target corporation (as opposed to its shareholders) lacked standing to sue under the Williams Act for equitable relief. The Fourth Circuit rejected that view at 1222–1224, and then turned to the decisive issue:

> The real question that the district court should have addressed, then, was whether the plaintiff's showing of the alleged inaccurate, untruthful, incomplete, or misleading character of the defendants' Schedule 13D was sufficient to resist a motion to dismiss or a motion for summary judgment.

On that issue the court of appeals held that the district court erred in dismissing Dan River's complaint. After observing that the "particular statement on which Dan River centers it attack is the statement of purpose of acquisition, as required under the statute," the court of appeals stated: "The defendants at no point have declared clearly the purpose of their acquisition." The Fourth Circuit considered that, given the arrangements made by Unitex, it was only logical to conclude that "there was some purpose beyond mere investment for investment sake." *Id.* at 1225. The court continued:

> This logic becomes even more persuasive when it is noted that, judging by the size of the loan secured to finance these purchases, the defendants are looking to the purchase of approximately twenty percent of the outstanding equity stock in Dan River. Such an accumulation of stock in a publicly held corporation frequently is regarded as control of a corporation. It is highly unlikely that Unitex would be seeking control of another corporation at considerable cost to it, if its interests were solely for investment.

The Fourth Circuit then said, in language which helps explain the rationale of *Dan River* in the context of the case at bar:

> In this Schedule they say they may seek control of Dan River through their purchases, but presently they do not seek control. Of course, at this point in their purchase program when they have ac-

quired but some eight percent of Dan River's stock, they could not hope to exercise control. But what is their intention if they successfully acquire the twenty percent of the Dan River stock they actually seek under their supposed plan of acquisition? Will they then seek control or at least seek to influence the decisions and actions of the target corporation? Is the language of the Schedule to be construed as suggesting that they have no plans, whether exercisable at present or not, in connection with the purchase of Dan River stock when they have made their anticipated purchases? *That they have no plan is inconceivable.* There are significant items in the record which suggest that the purchases are part of a carefully formulated plan and that, in their extensive purchases, they intend to facilitate that plan. Thus, when the defendants sought financing for their purchases from Wardley, their lead banker, they were told that Wardley would consider the proposed financing, but only if it was convinced of the "financial soundness of Uniex's plan." Wardley agreed to finance the purchase. Presumably, then, Unitex disclosed to Wardley its purpose and plan in the proposed purchase. What was the "plan?" The defendants do not disclose it in this Schedule 13D. (emphasis added).

In that factual context, the Fourth Circuit quoted from *Chromalloy* in a footnote appearing at 1226 n. 9:

Although the present requirements for Item 4 of a Schedule 13D do not use the word "control," but rather require disclosure of any "plans or proposals which result in or relate to extraordinary corporate transactions," SEC Exchange Act Releases Nos. 33–5925, 34–14692, IC–10212, 43 Fed.Reg. 18484, 18493 (1978), the Eighth Circuit assumed, and we think correctly, that "any control purpose is still measurable against the definition of control appearing in Rule 12(b)–2(f)." *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d at 245–46 n. 12. Moreover, in defining "control" as applicable to a Schedule 13D filing, *Chro-*

*malloy, Id.* at 246–47, directs us to look to Rule 12b–2(f), which provides

"The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

17 C.F.R. § 240.12b–2(f) (1979). Under this definition we believe that section 13(d) requires disclosure of a control purpose whenever "the securities purchaser has a perceptible desire to influence substantially the issuer's operations," 611 F.2d at 246–47 (citing *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 696–97 (2d Cir.1973)), regardless of proof of a "fixed plan" to acquire control. 611 F.2d at 247. That is, "Item 4 of Schedule 13D requires disclosure of *a purpose to acquire control,* [a word encompassing even 'the [indirect] power to ... cause the direction of ... policies,'] even though *this intention has not taken shape as a fixed plan." Id.* (emphasis added).

In the case at bar, the SEC gives the phrase "a perceptible desire to influence substantially the issuer's operations" an expansive reading requiring disclosure of desire before desire crystallizes into decision. The SEC is quite plain about that; its brief argues at 52:

a "decision" as to a particular course of action to effect a control purpose is not the event that triggers the obligation to amend the purpose section of a Section 13D. What triggers that obligation is the change from holding the securities for "investment only" to holding the securities with "a perceptible desire to influence substantially the insurer's operations."

Defendants, on the other hand, give the *Chromalloy* phrase a more narrow reading. Defendants stress that the *Dan River* footnote expresses the Fourth Circuit's belief that § 13(d) "requires *disclosure of a*

*control purpose* whenever 'the securities purchaser has a perceptible desire to influence substantially the insurer's operations,' ... regardless of proof of a 'fixed plan' to acquire control." (emphasis added). Defendant Lafer argues in his reply brief at 14:

> All that sentence means is that the decision to seek control requires a filing, even though the securities holder has not decided on the means to do it.

I agree. The facts in both *Chromalloy* and *Dan River* were sufficient to establish the defendants' formulation of a control *purpose,* that is to say, an *intent* to acquire control, prior to the filings at issue. Furthermore, those facts were central to the appellate decisions in *Chromalloy* and *Dan River.* Were it otherwise, the Eighth Circuit in *Chromalloy* would not have needed to quote the district court's finding that defendants "had the intent to control *Chromalloy* from the beginning," or to recite the various facts demonstrating that initial intent. Nor would the Fourth Circuit in *Dan River* have emphasized Unitex's "plan," logically consistent with gaining control, and pre-existing the challenged Schedule 13D amendments.

If the hot air balloon of desire is separated from the ballast of control purpose or intent, it is left free to soar wherever the an advocate's winds may blow. Shareholders subject to Williams Act reporting requirements will not know when initial itch matures into reportable "desire," and the reporting of desires not yet transformed into purpose or intent could mislead investors in manners contrary to the statute's purpose. To change the metaphor, the SEC argues for a § 13(d) "Streetcar Named Desire." I do not think that streetcar runs.

While the SEC also relies upon *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988), that case does not in my view materially affect the § 13(d) analysis. *Basic* construed the general antifraud provisions of § 10(b) and held that in the totality of circumstances preliminary merger negotiations may sometimes be material, thereby placing upon the seller of securities the duty to disclose or abstain from selling. Accepting, as of course I do, that general proposition, in the case at bar the SEC's claimed § 10(b) violation is based entirely upon the alleged violation of § 13(d)'s particular reporting requirements. Given the form of the pleading, if there is no violation of the particular disclosure requirements of § 13(d), there can be neither in logic nor in law a violation of the general disclosure provisions of § 10(b). If, as the SEC appears to suggest, *Sea Going Uniform Corp. v. Texaco,* 705 F.Supp. 918 (S.D.N.Y. 1989), stands for the proposition that § 10(b) may be violated where § 13(d) is not, I respectfully decline to follow it.

■ The briefs of counsel cite numerous appellate and district court decisions. I have not discussed them all. They may not all be fully reconcilable. I conclude, however, that under Second Circuit authority, defendants were under no duty to report preliminary considerations of a proxy contest for Graphic, any more than they were required to report other options under consideration. The duty to report arises only when a stockholder forms the purpose, which is to say the intention, of acquiring control of the company. Once that intention is formed it is reportable, although the particular strategy by which the intention is to be implemented may not yet be finally fixed.

As noted, the SEC bears the burden of establishing that factual proposition at trial. The question on summary judgment is whether the SEC has come forward with specific facts showing that there is a genuine issue on the point requiring trial.

Before considering the evidence in detail, three preliminary points may usefully be made.

First, the evidentiary record is extensive. During the course of the SEC's pre-complaint investigation and subsequent discovery, all the principal actors in the drama and many of the supporting players have been deposed, some more than once. Vast numbers of documents have been produced. It is difficult to imagine that a trial would generate significant additional facts.

Second, the SEC's brief does not fully convey the contents and substance of LACO's Schedule 13D. A typical paraphrase appears at p. 7 of the brief:

> The Joint Schedule 13D stated that "[e]ach of LACO and the Other Filing Persons has acquired the shares of common stock which he owns … for the purpose of making an investment in [Graphic] and not with the present intention of acquiring control of [Graphic's] business."

In point of fact, the Schedule 13D stated considerably more than that. LACO disclosed that it had acquired Graphic's shares "in connection with arbitrage;" that LACO supported Graphic's public announcements regarding its intention to liquidate its assets; and that if Graphic abandoned that intention, "LACO intends to review its position and take any such action as it deems appropriate at the time."

The third observation, related to the second, is that amendments to a Schedule 13D may fairly be construed only in relation to the original filing they are drafted to amend: just as variations on a musical theme may be understood only in relation to the theme itself.

*The Evidence*

■ In the case at bar, the SEC does not criticize defendants' original Schedule 13D. The SEC's theory of the case is that defendants failed to timely report a change of purpose in the amendments.

In reviewing the evidence, the SEC first refers to discussions that LACO representatives had in 1985 with attorneys John Hearne, John Olson, and Joshua Berman. These contacts, conducted primarily by a LACO analyst named Corey Horowitz, may fairly be characterized as preliminary inquiries concerning LACO's options if Graphics did not proceed promptly with the anticipated liquidation. However, there is no evidence that anyone with authority to bind LACO to a course of conduct had formed the purpose or intention of acquiring control of Graphic in these early days. Indeed, Horowitz's testimony relating to that period of time is that whenever he suggested to Amster or Lafer that LACO seek control of Graphic, Amster and Lafer replied in substance, "no, we are not that type of firm." Horowitz Investigation Tr. at 78–81, 85–86. Amster has testified that LACO's policy was not to enter into proxy contests or other hostile situations, and that he made that policy known to the General Electric Pension Fund, LACO's largest limited partner. General Electric witnesses confirmed that they were advised of LACO's policy in that regard. There is no contrary evidence.

We come then to the events following Graphic's filing of its S–1 on January 28, 1986. It is this filing which prompted Lafer's telephone call to Graphic's general counsel, Dodge, during which Lafer described the LACO investors a "unhappy shareholders." Lafer then consulted LACO's counsel, Arnold Jacobs of the Shea & Gould firm, and asked if LACO's new perception and sentiment required an amended to the purpose section of the 13D. Jacobs responded in the negative.

There then ensued two meetings with other Graphic investors upon which the SEC places considerable emphasis. Another large Graphic investor was called the Olayan Group. According to a memorandum prepared on February 6, 1986 by Elaine Ruege, an Olayan employee, on February 3, 1986 she and another Olayan employee, Scott Bessent, met at LACO's offices with Amster, Lafer, Packer, and Stephen Greenberg. Greenberg, a lawyer, was at the time a general partner of LACO. Ruege's February 6 memorandum to the file identifies Amster and Lafer as representing LACO, and Greenberg and Packer as representing Flex Holding. Flex Holding was a New York corporation formed for the purpose of making investments. Greenberg and Packer were officers and directors of Flex Holding.

The Ruege memorandum refers to Graphic's S–1, and then says:

> Lafer Amster is proposing that the shareholders group together in a proxy fight and force Mr. Yampol to liquidate the company. The following is the proposal:

There follows a detailed outline of how a proxy fight would be conducted.

It is startling to note that in sworn testimony, Amster, Lafer and Greenberg each denied that any meeting had taken place on that date or any other with Olayan representatives, or that such a proposal was put forward to that group. Ruege was deposed and testified that indeed the meeting did take place. For the purpose of their summary judgment motion, the defendants are prepared to accept Ruege's testimony as accurate; thus they argue that the conflict does not give rise to a triable issue of fact within the Rule 56 context.

It is difficult to imagine why Ruege, for all that appears an entirely disinterested witness, would invent such a meeting and such a proposal, or dictate to her office file a detailed memorandum about non-existent events. Accordingly I can repose little confidence in the testimony of Amster, Lafer and Greenberg on the point; and the SEC argues, understandably enough, that notwithstanding defendants' tactical concession for the purpose of their motion, this conflict in the testimony casts doubt upon the credibility of everything these witnesses say. In particular, the SEC argues that they should not be believed when they testified, as all of them did, that LACO did not decide to attempt to gain control of Graphic by means of a proxy contest until Friday, February 28, at the earliest.

The difficulty with the SEC's approach is that it cannot establish a factual proposition upon which it bears the burden of proof by attacking the credibility of witnesses whose testimony negates the proposition. "When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984).

On February 4, 1986 a meeting took place which everyone agrees occurred. On that date, Amster and Lafer met with representatives of the General Electric Pension Fund and advised its representatives,

Dale Frey and Art Bahr, that LACO was considering a proxy contest as one among several possible responses to the Graphic S-1.

During the ensuing days, Amster and Lafer had communications with other Graphic investors, and received the advice of Jacobs that they should retain counsel to advise them further. For reasons that I need not describe the Shea & Gould firm was not able to advise LACO in this regard. LACO selected the Willkie Farr & Gallagher firm. Amster and Jacobs attended a preliminary meeting at that firm's offices on either February 13 or 14, 1986.

There is no evidence to support the proposition that during the period of time February 3 to February 13 or 14, the responsible officers of LACO had formed an intent or purpose to obtain control of Graphic by means of a proxy contest. Not even the Ruege testimony and memorandum to file, when considered carefully, support that proposition. The language Ruege used in her memorandum was that Lafer, Amster "is proposing" that Graphic shareholders group together in a proxy fight. In her testimony Ruege characterized LACO's proposal as "just a concept of what they wanted to do. So I don't think they were asking our support to do anything." Tr. 91. That testimony is consistent with LACO's consideration of a proxy fight as a future possibility, rather than a then existing decision to conduct one. Had Lafer and Amster "screwed up their courage to the sticking point," they would presumably have asked Olayan Group, a major Graphic investor, to support them in the venture, which Ruege testified did not occur. As for the meeting with the General Electric representatives, their testimony is that Amster and Lafer were speaking only in terms of various options, none of which had been decided upon.

At p. 23 of its brief the SEC says that at a meeting on February 10, 1986 Amster, Lafer, and Greenberg met to discuss how to respond to Graphic's Form 8-K announcing Graphic's intention to settle Yampol's claims. The SEC says that at that meeting, those individuals "reached a 'prelimi-

nary decision' to wage a proxy contest for control of Graphic ..." The citation for the phrase "preliminary decision" is to testimony Greenberg gave in a deposition in a civil action between private parties arising out of these events. But the SEC takes Greenberg's testimony badly out of context. What Greenberg actually said was that "that there had been a preliminary decision made after that 8K to consider waging a proxy fight for Graphic Scanning." Tr. 19. A preliminary decision to consider waging a proxy fight is quite different from a preliminary decision actually to wage it.

I need not dwell further upon the events of February 3 through February 13 or 14 because the SEC concedes in its Local Civil Rule 3(g) statement that there is no evidence that LACO decided to seek control of Graphic by means of a proxy contest prior to February 13, 1986. The SEC's Rule 3(g) statement, at pp. 6–10, sets forth "additional material facts precluding summary judgment in defendants' favor." ¶ H says:

> On or about February 13, 1986, defendants decided to wage a proxy contest for control of Graphic to thwart the settlement announced in Graphic's Form 10–k filed February 7, 1986. Defendants decided to wage a proxy contest because, in their view, the settlement unjustifiably would transfer to Yampol Graphic's most valuable assets and deprive defendants of the benefits of the liquidation announced in August 1984.

The SEC drafted that statement in the context of its contention that an intention to influence Graphic's operations, not yet hardened into a decision, was reportable under § 13(d). But I have held to the contrary.

As for the consultations with the Willkie Farr and Gallagher firm, which commenced on February 13 or 14 and culminated in the filing of amendment 7 to the Schedule 13D, announcing LACO's intention to conduct a proxy contest, all the evidence in the record—that of Amster, Lafer, Greenberg, Jacobs and the attorneys from Willkie, Farr & Gallagher—is to the effect that Amster and Lafer did not decide to embark upon a proxy contest until Friday, February 28, 1986 at the earliest. Up to that time, various possible courses of action, including a proxy contest but by no means limited to it, were discussed. There is no evidence to the contrary.

On this record, which is extensive, defendants are entitled to summary judgment dismissing the § 13D claim. There is no evidence to support any of the SEC's criticisms of LACO's 13D amendments. LACO had not reached a decision to wage a proxy contest prior to the time they announced that intention in amendment 7. As for the earlier amendments, they gave timely advice of "those matters not fully determined," to use Judge Pollack's phrase in *Todd Shipyards, supra.* Those amendments were sufficient when viewed in the context of the original Schedule 13D and the disclosures it made with respect to LACO's status as an arbitrageur, the reason for its particular interest in Graphic, and the possibility of alternative steps if Graphic seemed to be backing away from its announced intention to liquidate.

For reasons previously indicated, I also conclude that the SEC's § 10(b) claim falls with the § 13(d) claim.

The Clerk of the Court is accordingly directed to dismiss the complaint with prejudice.

It is SO ORDERED.