**AZURITE CORP. LTD., individually and on behalf of all others similarly situated, Plaintiff,**

v.

**AMSTER & CO., formerly known as Lafer, Amster & Co., Arnold Marvin Amster, Barry Stuart Lafer, and Joel Richard Packer, Defendants.**

No. 89 Civ. 0746 (SS).

United States District Court, S.D. New York.

Feb. 2, 1994.

---

**1.** Although Nicholas may have been acting as agent for JDC, Nicholas has not joined that company as a defendant.

Tomas Szoboszlai, Jaffe and Asher, New York City, for plaintiff Azurite Corp. Ltd.

Peter C. Neger, Shea & Gould, New York City, for defendant Amster & Co.

Herbert Stern, Stern & Greenberg, Roseland, NJ, for defendant Barry Stuart Lafer.

Donald D. Buchwald, Buchwald & Kaufman, New York City.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Azurite Corp. Ltd. ("Azurite") brings this action to recover damages from corporate defendant Lafer, Amster & Co., now Amster & Co. (hereinafter "LACO"), and its officers Arnold Marvin Amster ("Amster"), Barry Stuart Lafer ("Lafer") and Joel Richard Packer ("Packer") (together "defendants") for violation of § 10(b) of the Securities Exchange Act (the "Act") of 1934, 15 U.S.C. § 78j(b) and the rules and regulations promulgated thereunder. Defendants move for summary judgment under Fed.R.Civ.P. 56 and for sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 against Azurite and its counsel. Plaintiff opposes defendants' motion and seeks leave to amend its complaint to include a claim of insider trading in violation of § 13(d) of the Act, 15 U.S.C. § 78m(d). For the reasons stated below, defendants' motion for summary judgment is **GRANTED** but defendants' motion for sanctions under Rule 11 or, alternatively, under 28 U.S.C. § 1927 is **DENIED.** Plaintiff's motion for leave to amend its complaint is also **DENIED.**

### BACKGROUND

In 1988, the Securities and Exchange Commission ("SEC") commenced an action against LACO arising from the same transactions at issue in this case. On May 14, 1991, Judge Charles H. Haight in *Sec. & Exch. Comm'n v. Amster & Co.*, 762 F.Supp. 604, 615 (S.D.N.Y.1991), granted defendant's motion for summary judgment. For a detailed history and thorough description of the facts of this case, the avid reader is referred to Judge Haight's decision. I describe only an abbreviated summary of the facts pertinent to the motion before me.

In the course of its operations, LACO, a registered broker-dealer in the business of risk arbitrage, became interested in Graphic Scanning Corporation ("Graphic") as a potential investment target. Graphic was in the process of liquidating assets that LACO believed to be undervalued. As a risk arbitrageur, LACO began buying Graphic stock at the then prevalent low market value with the expectation of either selling the stock before liquidation or obtaining the higher value per share it anticipated stockholders would receive once Graphic liquidated its assets.

LACO's purchases eventually surpassed 5% of all outstanding Graphic stock, triggering the disclosure requirements of the Securities Exchange Act of 1934. Accordingly, on August 19, 1985, LACO filed a Schedule 13D disclosure statement setting forth the investment purpose of its holdings in Graphic. The Schedule further represented that:

> Each of LACO and the other filing persons supports the Company's [Graphic] public announcements ... regarding its intention to develop a plan of asset distribution to its stockholders.... If the Company [Graphic] abandons its intention referred to above ... LACO intends to review its position and take any such action as it deems appropriate at the time.

On January 28, 1989, Graphic filed a Form S-1 statement stating that it would sell only those assets for which it obtained appropriate offers. Graphic also disclosed the existence of ongoing negotiations to sell its profitable cellular radio properties to Barry Yampol ("Yampol"), the founder and chairperson of Graphic and sole shareholder of plaintiff Azurite, a major institutional investor in Graphic stock.

LACO believed these negotiations signaled a change in Graphic's liquidation strategy and Lafer telephoned Graphic's general counsel Jonathan Dodge and requested fur-

ther clarification of the S–1 filing. When Dodge confirmed that Graphic was reevaluating its liquidation strategy, Lafer advised Dodge that LACO was "an unhappy shareholder."

During the four weeks that followed this conversation, LACO officers met with various attorneys, financial planners and other institutional investors in Graphic stock to study the alternatives available to LACO as a disgruntled investor. For example, on February 3, 1986, Amster, Lafer and Stephen Greenberg, LACO's lawyer and general partner, met with Elaine Ruege ("Ruege"), a representative of the Olayan Group, a major institutional investor in Graphic stock, to discuss the available options. In a memorandum to the file dated February 6, 1986, Ruege stated that in the meeting LACO had proposed that Graphic shareholders group together and force the company's liquidation. *See Amster & Co.*, 762 F.Supp. 604, 615 (S.D.N.Y.1991). On February 4, 1986, Amster and Lafer also met with the General Electric Pension Fund, another institutional investor, to discuss a proxy contest as one of the alternatives available to prevent Graphic's selective sale of assets, including that of the cellular division to Yampol.

During the same period, LACO continued its investment in Graphic shares. On February 3, 1986, LACO purchased 1.7 million dollars in Graphic convertible debentures with no voting rights. Additionally, on February 4, 1986, LACO purchased 17,500 shares of Graphic common stock. Its purchases continued with 87,500 shares on February 6 and 100,000 shares on February 7. On February 14, defendants Lafer and Amster individually each purchased 25,000 shares. *See Amster & Co.*, 762 F.Supp. 604, 607.

A rapidly unfolding series of events saw LACO's investment strategy change from passive investment on February 3, 1986, to an aggressive proxy-battle for control of Graphic on February 28, 1986. On February 7, Graphic filed an 8K Form with the SEC noting that it was transferring its interest in its radio telephone services to Mr. Yampol. On February 10, however, LACO filed Amendment 5 to its Schedule 13D statement,

indicating that there had been no change in its investment strategy. Nevertheless, according to uncontested deposition testimony, that same day, LACO received notice of the contents of Graphic's 8K statement.

Thereafter, LACO met with various outside counsel and consulted financial advisors Morgan Lewis Githens & Ahn about its alternatives. Finally, because other outside counsel could not advise them for reasons not relevant here, LACO's officers met with attorneys from the law firm of Willkie Farr & Gallagher on February 13 or 14, to further discuss alternatives to Graphic's decision.

On or about February 18, 1986, LACO filed Amendment 6 where it advised that LACO was beginning to consider, on a preliminary basis, a proxy battle for control of Graphic. LACO represented that its consideration was prompted by Graphic's change in liquidation strategy and its decision to sell its cellular division to Yampol. On March 3, 1986, LACO filed Amendment 7 where it revealed its decision to wage a proxy battle for Graphic effective as of February 28. Subsequently, LACO acquired control over Graphic; Graphic then elected a new board of directors and retained Drexel Burnham Lambert ("Drexel") to conduct its asset liquidation.

Following an exhaustive two-year investigation, the SEC brought charges under §§ 10(b) and 13(d) against LACO, Amster and Lafer and under § 13(d) against Packer for their failure to make timely disclosure of their decision to wage the proxy battle. On February 1, 1989—two months after the SEC brought its enforcement proceeding— Azurite commenced this action but the parties shortly thereafter agreed to place Azurite's action on the suspense docket pending resolution of the SEC enforcement proceedings before Judge Haight.

In essence, Azurite's claims mirror the SEC's charges. Azurite maintains that defendants failed to timely disclose their intention to wage a proxy contest for control of Graphic by omitting information and making false statements of fact in their fifth, sixth and seventh amendments to the Schedule 13D statement. Azurite also maintains that

defendants obtained from Drexel non-public information on Graphic and used this information to wage the proxy fight for Graphic's control.

During the SEC enforcement proceeding, defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that the complaint failed to state a claim. The SEC opposed the motion arguing under Rule 56(f) that additional discovery was necessary before the Court considered defendants' motion. The parties conducted additional discovery and defendants again moved to dismiss. In light of the parties' submissions, Judge Haight treated defendants' motion as one for summary judgment, granted defendants' motion and ordered the complaint dismissed with prejudice. The SEC moved for reconsideration which motion Judge Haight denied. The SEC then filed a notice of appeal which it later withdrew for reasons that are not clear on the record but are nonetheless irrelevant to the issues before me.

Following Judge Haight's decision, defendants asked Azurite to withdraw its claims. Azurite declined. On October 2, 1992, the case was reassigned to my docket. I held a case management conference where defendants indicated their intention to file a motion to dismiss and for summary judgment. I inquired whether plaintiff required any discovery which did not duplicate that already undertaken and disclosed during the SEC action in order to respond to defendants' proposed motions. Azurite requested leave to take six additional depositions of Drexel employees. These depositions, Azurite explained, were necessary because it had reason to believe that defendants had conspired with Michael Milken ("Milken") and other Drexel employees to take over Graphic. According to Azurite, Drexel had acquired inside information about Graphic in 1984 when Graphic retained Drexel as an underwriter for a bond financing. Azurite maintained that when Yampol called off the financing, Milken decided to "get back" at Graphic by providing defendants with information that eventually enabled them to take over Graphic.

In addition to taking the six Drexel depositions, Azurite issued document subpoenas on the Drexel Liquidating Trust, Cahill Gordon & Reindel, the SEC, Willkie, Farr & Gallagher, and requested and received from defendants further document production and answers to interrogatories. After completing this discovery, Azurite moved to amend its complaint to include more detailed allegations of insider trading and of a conspiracy between Drexel, Milken and defendants to take over Graphic. Defendants moved for summary judgment and opposed Azurite's motion to amend its pleadings.

Azurite advances three reasons why defendants' motion should be denied and its motion to amend the complaint granted. *First,* Azurite maintains that Judge Haight misinterpreted the law applicable to § 13(d) actions when he held that "defendants were under no duty to report preliminary consideration of a proxy contest for Graphic, any more than they were required to report other options under consideration." *Amster & Co.,* 762 F.Supp. at 614. *Second,* Azurite contends that even if Judge Haight properly interpreted the law, he erred in holding that no reasonable jury could find that defendants were involved in more than preliminary negotiations to acquire Graphic prior February 28, 1986. *Third,* Azurite argues that it has introduced circumstantial evidence of defendants' insider trading and of defendants' intention to stage a proxy contest sufficient to preclude summary judgment.

## SUMMARY JUDGMENT

Summary judgment is appropriate where: the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. 56.

A party moving for summary judgement bears the initial burden of establishing that there are no genuine issues of material fact; once the movant meets this burden, the party opposing the motion for summary judgment must set forth those specific facts which the party genuinely controverts and that the tri-

er of fact must decide at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). A judge must draw all reasonable inferences in favor of the party opposing the motion. *See Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). However, the party opposing the motion must do more than "show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and may not rest upon mere "conclusory allegations" or denials but must set forth the facts in controversy that must be determined at trial. *See National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (1989) (quoting, *R.G. Group, Inc. v. Horn and Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). A court must then determine "whether a reasonable juror could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## I. The Schedule 13D Claim

Azurite's first argument invites me (1) to revisit Judge Haight's decision and to find that his interpretation of the disclosure requirements of Schedule 13D is incorrect, or (2) to find that even if Judge Haight was legally correct, summary judgment is inappropriate in light of the circumstantial evidence Azurite has submitted in opposition to defendants' motion. A careful review of Judge Haight's decision and case law relevant to this question, however, leads me to conclude that Judge Haight's interpretation of Schedule 13D is correct as a matter of law. In addition, I find that the evidence presented by Azurite is insufficient, as a matter of law, for any trier of fact to reasonably conclude that Azurite has demonstrated by a preponderance of the evidence that defendants decided to wage a proxy battle for control of Graphic before February 28, 1986.

In *Amster & Co.,* Judge Haight examined the evolution of LACO's investment strategy

in Graphic stock. Following an analysis of applicable law, Judge Haight held that parties filing Schedule 13D statements must disclose "an intention to acquire control," *Amster & Co.,* 762 F.Supp. at 609 (quoting, *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), but parties are not required to "report preliminary considerations of a proxy contest ..., any more than they were required to report other options under consideration." *Amster & Co.,* 762 F.Supp. at 614. Judge Haight reviewed the voluminous discovery created by the SEC's two-year investigation and concluded that "[defendants] did not decide to embark upon a proxy contest until ... February 28, 1986 at the earliest." *Id.,* at 617.

▪ I agree with Judge Haight's interpretation of the law and that of Judge Milton Pollack in *Todd Shipyards Corp. v. Madison Fund, Inc.,* 547 F.Supp. 1383, 1387 (S.D.N.Y. 1982), that § 13(d) does not require a party filing a Schedule 13D statement to disclose preliminary considerations, exploratory work or tentative plans to wage a proxy battle and that it only requires disclosure of definite plans. *Amster & Co.,* 762 F.Supp. at 610 (quoting, *Todd Shipyards Corp.,* 547 F.Supp. at 1387). I therefore adopt as my own Judge Haight's interpretation of the applicable law.[1]

▪ Like Judge Haight before me, I have parsed through the parties' voluminous submissions, which include, among other items, excerpts from the depositions taken in the SEC enforcement proceedings, the six additional depositions of Drexel employees taken in this action, and the eighty-eight exhibits submitted in support of Yampol's declaration. Not one of these documents, however, sets forth evidence sufficient to contradict Judge Haight's or my determination that defendants' discussion with other institutional investors, financial advisors and attorneys was anything other than a preliminary study of the alternatives open to LACO in light of

---

1. Azurite also contends that the May 30, 1978 amendment to Item IV, Purpose and Transaction section of Schedule 13D calls for a different conclusion. I disagree for the same reasons stated at p. 2 of Judge Haight's Memorandum Opinion and Order dated December 13, 1991 denying the SEC's motion for reconsideration. *See* Exhibit B to Peter C. Neger's Affidavit In Support of Motion for Summary Judgment and for Sanctions.

Graphic's sudden change in liquidation strategy.

To the contrary, each and every deposition only underscores that LACO was simply exploring all available alternatives, including litigation, selling Graphic's stock, waging a proxy fight, a combination of the above, or doing nothing. For example, in describing LACO's contacts with the law firm of Willkie, Farr & Gallagher after February 13 or 14, Stephen M. Greenberg, LACO's attorney and general partner, testified that "there was an ongoing exploration process of the various alternatives that the people at Willkie Farr were engaged in, which culminated on March 2nd." Greenberg explained that the purpose of the meetings with Willkie, Farr were "to pull together all of the exploratory work that had been ongoing and make [sic] a decision as to what action we should take," and to explore the "[p]ossibility of doing nothing, possibility of doing a proxy fight, possibility of doing consents, possibility of just litigating, possibility of doing a proxy fight and litigating, possibility of doing a proxy fight and litigating in Delaware." Similarly, Corey M. Horowitz, a former LACO employee, testified that LACO's initial discussions never "rose to the level of we are interested in doing one [proxy contest].... The discussion never rose to the level of "a resolve to do a proxy fight."

In a similar vein, Arnold Jacobs of the law firm of Shea & Gould who originally represented LACO testified that following Graphic's disclosure that it intended to sell the cellular radio division to Yampol, LACO partners thought that "it was time to give some kind of preliminary consideration to what remedies [defendants] might try to invoke." Jacobs recalled that LACO explored "the possibility of going into court ... the remedy of possibly engaging in a proxy contest, and ... there were other things discussed, other than of course, just selling out the position or sitting still." He described the investigatory work that took place during February 1986 as "just exploratory conversations," and that the decision to go ahead was "made sometime in the 28th, probably late in the day in the 1st or the 2nd...." Finally, John J. McCarthy, Jr. of Davis, Polk and Wardwell

who represented Morgan Lewis in their discussions with LACO, echoed Jacobs' testimony by stating that a meeting held to discuss Graphic's sudden change in liquidation strategy was mostly "a background presentation" where the attendees discussed "[w]hether [LACO] wanted to sell [Graphic's] stock, finance the stock. There are 100 routine things you can do. Any action you might take as a stockholder: buy, sell, try to get financing, try to change the course of the affairs of the company." Other deponents like John A. Morgan of Morgan, Lewis, Githens & Ahn, characterized the ongoing meetings in February as meetings where the attendees merely "thr[ew] out ideas."

■ Azurite contends, however, that Judge Haight overstepped his bounds and I would err in determining when a defendant forms the intent to wage a proxy battle. Azurite maintains that it is up to the trier of fact to determine whether defendants intended to wage a proxy fight for Graphic prior to February 28. I agree, as did Judge Haight, however, that each case turns "on its own facts," *Amster & Co.*, 762 F.Supp. at 610 (quoting, *Todd Shipyards Corp.*, 547 F.Supp. at 1387), and when a plaintiff fails to raise a genuine issue of material fact for trial regarding the time at which a defendants's intention to wage a proxy battle was formed, summary judgment can be granted.

Azurite relies heavily on two pieces of circumstantial evidence to contravene defendants' evidence and substantiate its position that defendants intended to wage a proxy fight for control of Graphic as early as February 3, 1986. First, Azurite argues that defendants' purchase of Graphic stock after LACO informed Graphic that it was an "unhappy shareholder" is evidence of defendants' decision to take over Graphic because the purchases are inconsistent with being an "unhappy shareholder." If LACO was worried about the solidity of its investment in Graphic, Azurite's argument goes, it is illogical that LACO would go ahead and purchase additional Graphic shares. I disagree.

Before its decision to wage the proxy battle, LACO's purchases of Graphic stock continued only from February 3 to February 7, well before February 10 when Graphic an-

nounced its decision to sell its radio telephone services to Yampol. In fact, LACO expended $1,466,250 to purchase Graphic convertible debentures with no voting rights and $1,410,000 for common stock from February 3 to February 7. It is counter-intuitive to argue that LACO, during this period, would spend more than half of its expenditures in Graphic stock in non-voting debentures if it had already decided to wage a proxy contest for Graphic, particularly when in September of 1985, LACO's bond offering (handled by Drexel) had placed limits on the amount of money LACO could invest in securities of any given company. If LACO intended to wage a proxy fight for Graphic then surely it would not have expended restricted financial resources in non-voting debentures. LACO's investment strategy was thus consistent with the only evidence of LACO's intent on the record before me: LACO was keeping all alternatives open, and had not decided to wage a proxy contest for Graphic.

Second, Azurite also places heavy emphasis, as did the SEC, on a meeting defendants held at LACO's offices on February 3 with Elaine Ruege of the Olayan Group to discuss the Graphic situation, a meeting LACO, Lafer and Greenberg have denied ever took place. On February 6, Ruege prepared a memorandum to her file describing how LACO at the February 3 meeting had proposed that Graphic shareholders join together in a proxy fight to force Yampol to liquidate Graphic. Like Judge Haight, I do not understand why the LACO people deny that the meeting with the Olayan Group ever took place. Neither in her memorandum nor at her deposition did Ruege say that defendants had made a decision to mount a proxy battle for Graphic but rather that defendants were considering the possibility of a proxy battle, among other alternatives. Because defendants were not under a duty to reveal preliminary negotiations, defendants' proposal to the Olayan Group is nothing but that, a proposal, which defendants had no obligation to disclose in their Schedule 13D filing. In any event, I concur with Judge Haight's conclusion that the Ruege memorandum at best calls into question whether the defendants' testimony that a meeting did not take place

should be believed but it does not provide affirmative evidence that what was discussed at the meeting was contrary to what the memorandum and Ruege claim it was. *See Amster & Co.,* 762 F.Supp. at 616.

In light of Azurite's failure to introduce competent evidence to establish a triable issue of fact with respect to defendants decision to wage a proxy fight, I am forced to agree with Judge Haight that "LACO had not reached a decision to wage a proxy contest prior to the time they announced that intention in Amendment 7. As for the earlier amendments, they gave timely advice of those matters not fully determined...." *Amster & Co.,* 762 F.Supp. at 617.

## II. The Drexel Conspiracy and Section 10(b)

■ In order to make a claim of insider trading, Azurite must demonstrate that defendants traded stock on the basis of non-public information obtained from an insider and with knowledge that the insider breached its fiduciary duty to the company. *Dirks v. Sec. & Exch. Comm'n,* 463 U.S. 646, 659, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983).

■ Placing heavy reliance on Mr. Yampol's declaration and its supporting exhibits, Azurite has spun a theory that LACO and Drexel conspired to take over Graphic as early as October 1985 with information Drexel obtained from its work in the ill-fated Graphic bond financing in 1984. Although I am required to draw all reasonable references in Azurite's favor, I am not required to credit unsupported factual allegations and innuendos as those contained in Yampol's declaration in support of plaintiff's opposition to the motion for summary judgment. *See, e.g., Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (conclusory allegations or denials unsupported by some affirmative indication of the veracity of its assertions will not defeat summary judgment motion); *Sandman v. Fed. Sav. Loan & Ins. Corp.,* 942 F.2d 793 (9th Cir.1991) (district court may decline to make unreasonable inferences from circumstantial evidence proffered by nonmovant).

Yampol's declaration and supporting exhibits do not raise a triable issue of fact. Azurite asks this Court to accept—without any supporting evidence other than Yampol's conclusory statements—that LACO obtained from Michael Milken and Gary Winnick of Drexel's convertible bond department, non-public information that allowed LACO ultimately to take control of Graphic. Azurite alleges that Milken and Winnick acquired this information in 1984 during their negotiations with Graphic for the bridge financing. After the deal fell through, Azurite maintains, Milken plotted to "get back" at Graphic by making available to LACO the insider information obtained during the 1984 negotiations. In exchange, LACO was to retain Drexel to liquidate Graphics' assets once LACO took over Graphic. Thus, the gravamen of Azurite's claim is that Milken and Winnick were seeking revenge for Graphic's cancellation of the $40 million bridge financing and that LACO willingly served as the vehicle for their revenge by using insider information to take over Graphic, and thus violated the disclosure requirements of § 13(d) and the strictures of § 10(b).

Evidence of this plot is supported, Azurite maintains, by four pieces of circumstantial evidence: [2] (1) Drexel's leak of non-public Graphic information to the Olayan Group and from the Olayan Group to LACO, (2) an internal memorandum prepared by LACO that made its way to Steven Anreder of Drexel, (3) a series of meetings between Drexel and LACO on December 1985 and February 1986, and (4) Graphic's retention of Drexel to liquidate Graphic in June 1986. None of these incidents standing alone or in concert create a reasonable inference that LACO conspired with Drexel to acquire control of Graphic with Drexel's information and, in so doing, violated §§ 13(d) and 10(b).

Azurite claims that Herbert Bachelor, a former Drexel vice-chairperson, obtained confidential information in the form of future earning projections from Graphic during Graphic's 1984 bond offering which information Drexel later leaked to the Olayan Group.

There are at least two fundamental problems with this assertion. First, Bachelor never testified, as Yampol states in his declaration, that anyone at Drexel had access to Graphic's future earning projections. Bachelor's testimony was that in the typical situation, Drexel would have access to confidential information through its normal due diligence review. He testified that Drexel "may have been provided with projected financial statements," but was unable to remember whether Drexel had access to or Graphic ever provided Drexel with non-public information. By contrast, Richard Hochman, another former Drexel employee, testified that he did not believe Drexel saw Graphic's earning projections because Drexel never performed a detailed due diligence investigation. Even assuming that Graphic provided Drexel with financial projections, Hofman further testified that the Olayan Group, as an institutional investor in Graphic stock, was the type of investor that would normally have access to this information. Therefore, it would not have needed the information from Drexel.

■ Second, even assuming that Drexel acquired confidential information from Graphic and that Drexel passed this information to the Olayan Group, there is no evidence that the Olayan Group or Drexel passed this information to defendants. Azurite deposed six Drexel employees and not one testified that they passed Graphic confidential information to defendants. As noted by defendants, Azurite's theory in this regard seems to be that because the Olayan Group had access to allegedly confidential information, and because defendants met with the Olayan Group, defendants must have acquired this information. This is the type of circular argument that has no validity. Mere opportunity to do an act, standing alone, is not enough to establish, by a preponderance of the evidence, that an act was done. *See, e.g., Slemrod v. Yardley Sav. & Loan Assoc.* [1989–90 Transfer Binder], Fed. Sec.L.Rep. (CCH) ¶ 94, 915 at 95,052–53 (E.D.Pa., June 19, 1989) (granting summary

---

**2.** Azurite also argues that defendant's purchase of Graphic stock after February 3, 1986 and the Ruege memorandum are evidence of LACO's conspiracy with Drexel to take over Graphic.

For the reasons previously discussed, I reject these allegations as not probative of defendants' decision to wage a proxy battle for Graphic.

judgment for the defendant after finding that "the fact that [defendant's] business contracts made it possible for him to learn about the merger negotiations does not establish that he actually learned about them," even though defendant invested more heavily in company's shares during merger negotiations). *Id.*, at 95,052–53. *Cf. also, Froid v. Berner,* 649 F.Supp. 1418 (D.N.J.1986) (plaintiff's allegation that defendant had access to confidential information insufficient to state a claim under 10(b)).

Azurite further maintains that an internal LACO valuation of Graphic assets dated August 12, 1985, which has the name and telephone number of Drexel analyst Steven Anreder noted on it, is evidence that Drexel shared confidential information with LACO and entered into a plot with defendants to take control of Graphic. Azurite fails, however, to establish (1) that Drexel had access to non-public information, (2) that this information was made available to Anreder, and (3) that Anreder passed this information to defendants.

Azurite has failed to set forth by affidavit or sworn declaration what specific information Yampol made available to Drexel. Azurite's inability to provide specific information about the non-public information it alleges it gave to Drexel is crucial because without it, there is no competent evidence from which an inference could be drawn that LACO's valuation was produced by reliance on non-public information. *See Shamrock Assocs. v. Horizon Corp.,* 632 F.Supp. 566, 571–72 (S.D.N.Y.1986) (dismissal warranted where plaintiff fails to identify the insider information a defendant has obtained). Not only does Azurite, through Yampol, however, fail to identify the specific non-public information it turned over to Drexel, Azurite also fails to prove that LACO's valuation must have relied on non-public information.

In fact, a cursory analysis of LACO's valuation which was presumably discussed or shown to Anreder of Drexel only reveals that LACO may have arrived at its valuation by just using a simple mathematical calculation with public information: the sum of the estimated value of Graphic's radio paging components ($300 million), the estimated value of the company's non-cellular assets ($47 million) and the estimated value of its cellular operations ($90 million) for a total of $567 million, divided by the number of outstanding shares ($47 million), which results in the estimated value of $12.06, a share.

I am being asked to deny defendants' motion for summary judgment on the basis of the fortuitous appearance of a Drexel name and number in LACO's internal valuation of Graphic. This occurrence is a slim reed on which to hang a theory of conspiracy or a secret plot between Drexel and defendants to take over Graphic particularly where plaintiff has shown no connection between LACO's valuation and whatever non-public information Graphic alleges it gave to Drexel. Azurite's evidence is simply insufficient to allow a reasonable trier of fact to conclude by a preponderance of the evidence that defendants either conspired to or shared non-public information.

Azurite further maintains that the meetings between Drexel and defendants in December 13, 1985 and February 5, 1986 are evidence of a plot to take over Graphic. However, Azurite does not seriously contest defendants' assertion that the primary purpose of these meetings was to discuss the possibility of raising additional capital for LACO, following Drexel's underwriting of LACO's 1985 $90 million bond offering. Azurite merely concludes, in spite of the uncontroverted deposition testimony to the contrary, that because LACO and Drexel met to discuss other business dealings, Milken must have used the occasion to pass to LACO non-public confidential information about Graphic. This characterization of events calls upon the trier of fact to accept speculative allegations without any foundation in the evidence.

Finally, Azurite urges this Court to treat the fact that Graphic's board retained Drexel as evidence of defendants' pay-off to Drexel for supplying the insider information necessary to take over Graphic. Azurite has not proffered any evidence that Drexel was incompetent to handle this transaction on behalf of Graphic or that it was a minor player in the market so that its selection for this transaction could be called suspect. There is

nothing in Drexel's prior dealings with LACO or Drexel's dealings with Graphic's new board of directors (of which Board LACO was not a member) which would provide a reason to call into question Graphic's business purpose in retaining Drexel. Once again, Azurite, without any evidence to support its contention, asks that a speculative inference be drawn from a transaction that is neither illegal nor whose circumstances objectively give rise to a reasonable suspicion. Thus, there is simply no evidence to support that the conspiracy Azurite claims existed, existed because Graphic's new board retained Drexel to liquidate its assets.

■ On the record before me and drawing all reasonable inferences in Azurite's favor, I must grant defendants' motion for summary judgment and dismiss Azurite's §§ 13(d) and 10(b) claims. I also deny Azurite's motion to amend its original complaint to include more specific allegations of § 10(b) violations. Although Rule 15 makes clear that leave to amend must be freely granted, it may be denied when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). As my discussion reveals, Azurite's proposed amendment would be futile because the factual foundations of Azurite's new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment. I therefore deny Azurite's leave to amend the complaint.[3]

I have provided Azurite with ample opportunity to explore and develop a factual foundation for its §§ 13(d) and 10(b) claims. This

case has come before me after lengthy and exhaustive litigation between the SEC and LACO on the legality of Amendments 5, 6, and 7 to LACO's 13D filing. The SEC enforcement proceedings produced voluminous and exhaustive discovery on the issue of LACO's 13D amendments which defendants made available to Azurite. I also permitted Azurite to conduct further discovery on its claim that Milken and other Drexel employees had provided LACO with insider information to take over Graphic in order to get back at Yampol. Thus, Azurite has had every reasonable opportunity to explore the only avenue that, arguably, the SEC failed to exhaust in its two-year investigation and subsequent enforcement action.[4]

The result of Azurite's discovery is a fascinating but wholly unsupported story of insider trading and machinations between LACO and Milken. Every single deposition as well as every last page of documentary evidence points to the same ineluctable conclusion: after exploring all of the available alternates, defendants reluctantly decided to wage a proxy battle for Graphic on or after February 28, 1986.

Simply put, Azurite has failed to introduce competent or admissible evidence that could lead a trier of fact to reasonably conclude that defendants filed false, misleading or materially deficient Amendments to their Schedule 13D filing. Similarly, Azurite has failed to proffer any competent evidence that could lead a reasonable trier of fact to find that Drexel or any of its employees provided

---

**3.** As an independent ground for opposing Azurite's motion to amend the complaint, defendants maintain that leave to amend is precluded by an agreement signed by the parties on January 22, 1990. In the agreement, Azurite releases defendants from "all manner of claims, actions, or proceedings of any nature which have been, could have been or could be brought" except "any claims asserted before December 15, 1989 (the "Azurite Claims") in the action entitled *Azurite Corp., Ltd. v. Amster & Co.....*" Because I have determined that defendants' proposed amendment is futile, I do not address this argument.

**4.** Defendants also maintain that Azurite's 10(b) claim must be dismissed on the alternative ground that Azurite failed to assert the claim within the statute of limitations set forth in

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (claims under § 10(b) must be asserted within one year of plaintiff's discovery of the violation and within three years of when the violation occurred). Because Azurite claims that the alleged insider trading took place between 1985 and March 1986, defendants maintain that Azurite's claim must be dismissed under *Lampf* because more than three years have passed since the alleged violation occurred and because Azurite's claim does not relate back to the original complaint. I disagree. In its original complaint, Azurite made general but sufficient allegations concerning defendants' § 10(b) violations to relate its proposed amendment back to its original complaint.

940

defendants with non-public information about Graphic.

## III. Sanctions

 One last issue concerns me here. Defendants move for the imposition of sanctions against Azurite and its counsel under Rule 11 and 28 U.S.C. § 1927. I agree with Azurite that sanctions are inappropriate in this case for the reasons expressed by the Second Circuit in *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991):

> [T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands. Thus, not all unsuccessful legal arguments are frivolous or warrant sanction. The positions advance by Mareno and his attorney, however faulty, were not so untenable as a matter of law as to necessitate sanction. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against.

In this case, Azurite argued unsuccessfully that I should revisit Judge Haight's holding that Schedule 13D disclosures must be made only where a party has made a decision to wage a proxy fight. I have rejected this argument on the basis of Judge Haight's opinion in *Amster & Co.* and Judge Pollack's decision in *Todd Shipyards Corp.* However, Azurite's good faith attempt to convince me that I should reject Judge Haight's legal analysis and interpretation of the deposition and documentary evidence, does not render Azurite's argument frivolous or patently unreasonable; rather, it simply means that I was unconvinced by the argument.

 Similarly, sanctions under 28 U.S.C. § 1927 are inappropriate. Section 1927 serves to deter unwarranted delays in litigation. *See United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991). Azurite's behavior during discovery has been both restrained and reasonable. Azurite accepted the discovery by the parties in the SEC enforcement action, required only six short depositions on its insider trading claims and issued some document production requests. Although the added discovery proved ultimately unhelpful, Azurite in no way unreasonably extended the life of this litigation or engaged in an unwarranted fishing expedition. I, therefore, deny defendants' motion for the imposition of sanctions.

## CONCLUSION

For the reasons stated above, defendants motion for summary judgment under Rule 56 on Azurite's §§ 13(d) and 10(b) claims is **GRANTED** and the complaint is **DISMISSED**. Azurite's motion to amend its complaint pursuant to Rule 15 is **DENIED** with **PREJUDICE**. Defendants' motion to impose sanctions on Azurite and its counsel under Rule 11 or, alternatively, under 28 U.S.C. § 1927 is **DENIED**. I hereby order the Clerk of the Court to **DISMISS** the Complaint with **PREJUDICE**.

**SO ORDERED.**