**REPUBLIC NATIONAL BANK, Plaintiff,**

v.

**John Leslie HALES, Defendant.**

**No. 97 CIV. 9289(RWS).**

United States District Court, S.D. New York.

Dec. 14, 1999.

Law Offices of Andrew S. O'Connor, New York City (Andrew S. O'Connor, Rosalie L. Spelman, of Counsel), for Plaintiff.

Rosenfeld Jacobs & King, New York City (Tab K. Rosenfeld, of Counsel), for Defendant.

## OPINION

SWEET, District Judge.

Plaintiff Republic National Bank of New York ("Republic") has moved under Rule 56, Fed.R.Civ.P., for summary judgment for the aggregate amount of $1,930,454.13, in addition to expenses and attorneys' fees, on its claims arising out of a promissory note and equity swap transaction entered into by defendant John Leslie Hales ("Hales") in the summer of 1997. Hales has moved to amend his answer to add various defenses and counterclaims based on Republic's alleged improprieties, as well as to add claims against non-parties Coast Partners Securities, Inc. ("CPS"), Sanjay Lillaney ("Lillaney"), and Richard Milner ("Milner") (collectively the "CPS Defendants"). Hales has also moved to compel responses to his Second Request for the Production of Documents, dated March 24, 1999. Upon the findings and conclusions set forth below, Hales' motion to amend his answer is granted in part and denied in part, and summary judgment is granted in favor of Republic. Hales' motion to compel is denied.

### Prior Proceedings

On December 17, 1997, Republic filed its complaint in this action, seeking payment of a July 15, 1997 promissory note, payment of indebtedness incurred by Hales pursuant to a July 15, 1997 "swap" transaction, interest, and an award of all reasonable expenses incurred as a consequence of Hales' failure to meet his financial obligations under the terms of the note and the swap. By an amended complaint dated January 7, 1998, Republic corrected a typographical error in its prayer for relief.[1] Hales' answer, filed on

---

1. A review of both the court file for this case and this District's "Chaser" system reveals that this amended complaint was apparently never formally filed. However, this technical

February 26, 1998, raised various "separate" defenses asserting Republic's "fiduciary duty to act in good faith and fair dealing," Republic's breach of the implied covenant of good faith and fair dealing, the doctrine of mutual mistake, and Hales' entitlement to a "set-off with respect to the monies wrongfully seized by plaintiff from defendant's bank account."

Discovery proceeded, and voluminous documents were produced. Depositions were taken, and recordings of relevant telephone conversations involving the parties were provided by Republic to Hales. After several extensions, a date certain of April 1, 1999 was set for the close of discovery.

By motion filed on March 4, 1999, Hales moved to amend his answer to raise additional defenses and counterclaims, including "counterclaims" asserted solely against non-parties CPS, Lillaney, and Milner. More specifically, in his proposed amended answer, Hales asserts the following: (1) a "separate defense" and counterclaim against both Republic and the CPS Defendants for "rescission of the transactions based on fraud"; (2) a separate defense and counterclaim against both Republic and the CPS Defendants "based on fraud"; (3) a separate defense and counterclaim against both Republic and the CPS Defendants for "conspiracy to commit fraud"; (4) a counterclaim against the CPS Defendants for breach of fiduciary duty; (5) a separate defense and counterclaim against Republic for "breach of its fiduciary duty to disclose material facts based on its superior knowledge, experience and bargaining power"; (7) a separate defense and counterclaim against both Republic and the CPS Defendants for negligent misrepresentation; (8) a separate defense and counterclaim against both Republic and the CPS Defendants for violation of Section 10(b) of the Securities and Exchange Act of 1934 (the " '34 Act"), and Rule 10b–5 promulgated thereunder; (9) a counterclaim against CPS for violation of Section 20–A of the '34 Act; (10) a separate de-

fense and counterclaim against Republic for "breach of the implied covenant of good faith and fair dealing"; (11) a counterclaim against the CPS Defendants for breach of the implied covenant of good faith and fair dealing; (12) a separate defense and counterclaim against both Republic and the CPS Defendants for violation of Section 349 of New York's General Obligations Law; (13) a defense against Republic for a "set-off against any liability ... equal to the amount of the monies heretofore seized by Republic from Hales' bank account in Switzerland," as well as the market value of the stock collateral retained by Republic; (14) a defense and counterclaim against Republic for failure to mitigate damages; and (15) a counterclaim against CPS based on its failure to properly supervise Lillaney and Milner. In general terms, the amended complaint claims that CPS and Republic conspired to take advantage of Hales, that the agreements to which Hales put his name were other than what they were represented by Republic to be, and that Republic engaged in behavior—such as short-selling of the stock collateralizing the promissory note—contrary to its assurances to Hales. Despite the fact that filing of an amendment at that juncture in the litigation required prior leave of court, Hales filed his amended answer on March 4.

By motion filed on April 8, 1999, Republic subsequently moved for summary judgment. A comprehensive briefing schedule for both Republic's motion and Hales' motion had been agreed upon by the parties previously, and was subsequently revised by the parties and approved by the Court. By letter application submitted on September 2, 1999, Hales moved to compel the production of various documents pursuant to his Second Request for Production of Documents. Oral argument was heard on September 8, 1999, at which time the motions were marked fully submitted.

oversight does not affect the outcome of the instant motions.

*The Parties and Relevant Non–Parties*

Republic is a national banking association organized under the laws of the United States of America, and maintains its principal place of business in New York, New York.

Hales is a citizen of the United Kingdom.

CPS is a California corporation with its principal place of business in San Francisco, California.

Lillaney is a citizen of the State of California, and resides in San Francisco, California. At all times relevant to the instant action, Lillaney was employed by CPS as Director of its Risk Management Group.

Milner is a citizen of the State of California, and resides in San Francisco, California. At all times relevant to the instant action, Milner was employed by CPS as Managing Director of its Risk Management Group.

*Facts*

The following are facts concerning which there is no dispute, except where otherwise indicated. These facts have been culled from the parties' Rule 56.1 statement, affidavits, and exhibits.

### 1. *The Background of the Transactions at Issue*

In May of 1997, Lillaney of CPS approached Republic's Derivative Products Group, inquiring about Republic's willingness to lend several million dollars to a number of shareholders of The Exploration Company (TXCO)—a corporation publicly traded on the Nasdaq exchange. One of the individual TXCO shareholders subsequently introduced to Republic by Lillaney and CPS was Hales. By a letter agreement dated May 14, 1997 between Hales and CPS, Hales had agreed to retain CPS to provide him with consulting and financial advisory services.

Republic was interested in extending a loan to Hales, but desired a "hedge" against the risk inherent in such a transaction. Hales, however, did not want "short-selling" of the collateral by Republic, its customary hedging strategy, to depress the market price for TXCO. There were discussion in which the parties sought to accommodate their respective desires, in part, by entering into an "equity swap" transaction calling for a payment—by either Hales or Republic—dependant upon the market value of Hales' TXCO stock as of the maturity date of the loan.

On May 16, 1997, after a number of exploratory telephone conversations between Lillaney and Jay Nadelson ("Nadelson") of Republic, Lillaney arranged a three-way telephone conversation among Lillaney, Hales, and Nadelson.[2] During that telephone conversation, Nadelson inquired as to whether Hales was an "eligible swap participant" within the meaning of 17 C.F.R. § 35.1(b)(2), and advised Hales that Republic would be seeking a representation that (1) Hales had a net worth of at least $10,000,000, and (2) that any equity swap transaction would be entered into as part of Hales' regular business. In response, Hales stated:

> Well I mean what's the issue. I mean I'm a high net worth.
>
> .    .    .    .    .
>
> To give you some idea, Peter Gruner [a fellow TXCO shareholder] manages $21 billion. To give you some idea of the

---

**2.** The telephone conversations between the parties, as well as between CPS employees and Republic, were recorded, and a significant number of those recordings produced to defendants. Those conversations were transcribed and submitted to the Court by Hales in connection with the instant motions.

While the accuracy of the transcripts was initially a matter of some dispute, a revised set of transcripts was submitted by Hales on November 12, 1999 as the result of the parties' resolution of various matters. While complete agreement apparently was not reached as between Hales and Republic, Republic has not specifically objected to or questioned any portions of the transcripts ultimately submitted.

substance of the people you're dealing with.

.    .    .    .    .

I've invested on Wall Street and Tokyo since I was 18, and I'm 45 now. . . . Options I've had $500 million foreign exchange positions outstanding. . . . I've had loads of equity swaps and option transactions.

.    .    .    .    .

I mean I would satisfy [the eligible swap participant] criteria easily. . . . I mean, both Peter [Gruner] and I have done as much as anybody anywhere in the world, I would imagine.

During this conversation, Nadelson also told Hales that "somewhere along the line" Republic would need "some reps and warranties" from Hales, to which Hales replied that his counsel was Shiv Grewal, Esq. ("Grewal") of Jones, Day, Reavis & Pogue ("Jones, Day"). During a later conversation with Lillaney and Nadelson, Hales represented to Nadelson that, "in terms of the derivatives business . . . Peter [Gruner] and [he] have done that for years," and that he knew that business "inside out." On June 4, 1997, Jones, Day issued an opinion letter (the "144 Opinion") concerning the unrestricted nature of the TXCO securities Hales wished to use as collateral for the loan, as well the validity of Republic's contemplated security interest in those securities.

Hales also provided Republic with a written personal profile stating that he "provides management consulting and corporate finance advice on a global basis," that the source of his wealth was "consulting fees from services to corporate clients and capital gains on investments over the last 20 years," and that he had assets of "50 million +," a net worth of "$45 million +," and annual income of "$1 million + a year."

In June of 1997, Hales executed a promissory note in the amount of $1,476,562.40 (the "June Note"), a Loan Agreement in Connection with Securities Transaction (the "June Loan Agreement"), and a Margin Agreement concerning Republic's security interest in 700,000 shares of TXCO stock that Hales had pledged as collateral for Republic's loan. Hales also signed an International Swap Dealers Association ("ISDA") Master Agreement (the "Master Agreement"), a "put" option "confirmation" issued in accordance with the Master Agreement (the "June Put"),[3] and an equity swap transaction confirmation (the "June Swap").

According to the basic terms of the June Note and June Loan Agreement, Hales agreed to pay Republic the loaned amount on December 4, 1997, together with interest in the amount of 7.21%. In the event of default, the post-default interest rate was to increase to 9.21%. The June Swap provided for payment to either Republic or Hales, according to a set formula, dependant upon the price movement of TXCO stock. The June Put, which set a "strike" price of 2.73 per share and a "premium" of 76,562, stated both that it was "European" style and that "cash settlement" would be applicable. Both the June Swap and the June Put explicitly stated that "[t]he definitions and provisions contained in the 1991 ISDA Definitions . . . and in the 1996 ISDA Equity Derivatives Definitions . . . are incorporated into this Confirmation." The June Put also indicated that CPS was the "Broker/Arranger" of the put option.

The 1996 ISDA Equity Derivatives Definitions ("ISDA Definitions") provide the following regarding "cash settlement":

In respect of each Exercise Date under an Option Transaction for which "Cash Settlement" is applicable, Seller shall pay to Buyer the Cash Settlement

---

**3.** The ISDA Master Agreement is a form of agreement developed to provide a standardized framework within which participants in swap, options, and other derivatives transactions can structure their financial dealings.

The Master Agreement signed by Hales and Republic contemplates that the parties would supplement the generic terms of that agreement with individual "confirmations."

Amount, if any, on the relevant Cash Settlement Payment Date for all Options exercised or deemed exercised on that Exercise Date.

ISDA Definitions § 5.1

The ISDA Definitions define "Cash Settlement Amount" as follows:

"Cash Settlement Amount" means . . . in respect of each Valuation Date . . . (b) under a Share Option Transaction . . . an amount, as calculated by the Calculation Agent, equal to the number of Options exercised or deemed exercised on the relevant Exercise Date multiplied by the Option Entitlement multiplied by the Strike Price Differential.

ISDA Definitions § 5.2

While the specific terms of the June Swap are somewhat complicated, in layman's terms the transaction provided that on December 4, 1997, either Republic or Hales would be obligated to pay a certain amount, depending on whether the value of TXCO stock was greater or lesser than its value as of the effective date of the June Swap.[4] The June Swap also provided that Hales would pay 7.21% interest on the swap's initial "notional" amount of $191,-406.25.

Under the terms of the June Put, if on December 4, 1997 the share price of TXCO were to be less than the "strike" price of 2.734375 per share, Hales would be entitled to a "Cash Settlement Amount"—a payment determined by multiplying the number of options to be exercised by the "option entitlement" of one share per option, and then multiplying this figure in turn by the difference between the per-share price of TXCO and the strike price. This form of settlement is to be distin-

guished from "physical" settlement under the ISDA definitions, where on a particular settlement date the party exercising a put actually delivers a set number of shares to the seller of the put at a predetermined settlement price.

During July of 1997, Hales expressed a desire to increase the amount of his borrowing from Republic. Republic agreed to extend the additional credit. Accordingly, the parties terminated both the June Put and the June Swap, and Republic paid Hales a "termination payment" in the amount of $37,000 in connection with the equity swap transaction.

In addition to terminating the June Put and the June Swap, on July 15, 1997 Republic and Hales entered into a replacement Loan Agreement (the "July Loan"), a replacement Margin Agreement (the "July Margin Agreement"), an amendment to the Master Agreement, a new promissory note in the amount of $1,740,-778.57 (the "July Note"), and new put and swap confirmations (the "July Put" and "July Swap") (collectively the "July Agreements"). The July Agreements were virtually identical in form to the June agreements they superseded, with the only significant differences in the documentation being the commencement date, the amount borrowed, the strike price[5] and premium of the put option, and the "notional" amount and number of units comprising the equity swap transaction.[6]

By December 4, 1997, the maturity date of the July Note, the expiration date of the July Put, and the termination date of the July Swap, the market price of TXCO had declined to $3.375. As a consequence, Ha-

4. It was in this way that the swap agreement provided Republic with a "hedge" against the risk that Hales' collateral would decline in value. Whereas "short selling" would presumably provide a hedge by allowing Republic to sell Hales' shares, only to replace them at a later date with equivalent shares at a lower cost to Republic, the swap agreement entered into by Republic and Hales guaranteed that Republic would be entitled to recov-

er additional amounts should TXCO's share price decline.

5. The strike price under the July Put was $3.00.

6. Whereas the June Swap had a notional amount of $191,406.25 and provided for 35,-000 "units," the July Swap had a notional amount of $271,625 and provided for 41,000 units.

les owed Republic $140,866.06 under the written terms of the equity swap transaction, and the cash settled put option expired with no amount owed by Republic to Hales. Hales did not pay Republic any portion of the amount owing under either the promissory note or the equity swap agreement.

### Discussion

#### 1. *Leave to Amend Shall Be Granted in Part and Denied in Part*

Hales' proposed amended answer asserts a variety of counterclaims against Republic absent from his first answer in this action, as well as a number of "counterclaims" against the CPS Defendants—who are not presently parties to this action. Certain of Hales' proposed claims against the CPS Defendants are asserted against the CPS Defendants alone. Others are asserted simultaneously against both Republic and the CPS Defendants.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." In this Circuit, a party is generally afforded leave to amend its pleadings under Rule 15(a) "in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993). Typically, the moving party's delay, standing alone, is not sufficient reason to foreclose amendment. *See id.; R.G.N. Capital Corp. v. Yamato Transport USA, Inc.*, No. 95 Civ. 2647(CSH), 1997 WL 3278, at *1 (S.D.N.Y. Jan.3, 1997). However, as the Second Circuit observed in *Block*, " '[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.' " 988 F.2d at 350 (*quoting Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir.1983)). In evaluating whether the nonmovant will suffer "prejudice," a court must consider whether amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial," "significantly delay the resolution of the dispute," or "prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350. Alternatively, amendment may be precluded where such amendment is futile. *See Schare v. Six Flags Theme Parks*, No. 96 Civ. 9377(RWS), 1998 WL 24361, at *3 (S.D.N.Y. Jan.23, 1998).

While a review of this Circuit's case law concerning the "futility" of amendment indicates that, in the main, a proposed amendment should be reviewed under a standard analogous to the standard of review applicable to a motion brought under Rule 12(b)(6), Fed.R.Civ.P., *see Aniero Concrete Co. v. New York City Construction Auth.*, Nos. 84 CIV. 9111, 95 CIV. 3506, 1998 WL 148324, at *7 (S.D.N.Y. Mar.30, 1998); *Finlay v. Simonovich*, No. 97 Civ. 1455(AJP)(DAB), 1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997), this need not always be the case. In evaluating the futility of amendment, a number of courts have held that a summary judgment standard may be applied and leave to amend denied outright should the party seeking amendment fail to satisfy that standard. *See Montalvo v. Sun Roc Corp.*, 179 F.R.D. 420, 424 (S.D.N.Y.1998) ("Were the Court to grant plaintiffs' motion for leave to amend, it is inevitable that defendants promptly would move for and be entitled to summary judgment. In light of plaintiffs' admissions and the undisputed facts uncovered during the course of discovery, the Court determines that no reasonable jury could find defendants liable based on the allegations in the proposed amended complaint. Accordingly, as the proposed amendment would be futile, the Court denies plaintiffs' motion for leave to amend the complaint.") (*citing Corcoran v. GAB Business Servs., Inc.*, 723 F.Supp. 966, 970 (S.D.N.Y.1989)); *Azurite Corp. v. Amster & Co.*, 844 F.Supp. 929, 939 (S.D.N.Y.1994) (denying plaintiff leave to amend complaint where plaintiff's proposed amendment "would be futile because the factual foundations of [its] new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment"), *aff'd*, 52 F.3d 15 (2d Cir.1995).

*But see HCC, Inc. v. RH & M Machine Co.*, 39 F.Supp.2d 317, 325 (S.D.N.Y.1999) (refusing to apply summary judgment standard to motion to amend, and contrasting limited briefing in that action with full summary judgment briefing presented to the court in *Azurite*, 844 F.Supp. at 939). Other courts, including this very Court, have at times allowed amendment, but simultaneously evaluated the amended pleading under the standards governing motions brought pursuant to Rule 56. *See Schare*, 1998 WL 24361, at *6 ("Where an amended claim would fail on a summary judgment motion, the court has discretion to treat the opposition to the amendment as a motion for summary judgment and to consider matters outside the pleadings in resolving the motion."); *Rogen v. Scheer*, No. 86 Civ. 2058(MJL), 1991 WL 33294, at *3 (S.D.N.Y. Feb.22, 1991) ("[W]here plaintiff's motion to amend the complaint and defendants' motion for summary judgment are presented together, it is proper for the Court to treat [the] motion for summary judgment as addressed to the complaint in the form in which it is sought to be amended."); *see also Mondello v. Dun & Bradstreet Corp.*, No. 94 Civ. 4383(RWS), 1996 WL 239890, at *1 (S.D.N.Y. May 9, 1996). Such treatment is especially appropriate where the parties have been afforded ample opportunity for discovery and are on reasonable notice that they will be called upon to demonstrate the existence of disputed, material fact(s). While there is a formal, procedural distinction to be made between denying amendment based on the proposed amendment's inability to survive summary judgment, and allowing amendment only to simultaneously dismiss the amended pleading under Rule 56, Fed.R.Civ.P., in practice these distinctions are not ones of terrific pragmatic consequence. The summary judgment standard is applied, and claims rejected.

While the proposed amended answer was submitted near the close of discovery

in this action, more than a year after Republic filed its complaint seeking satisfaction from Hales, this delay alone does not bar Hales from now seeking to amend his answer to raise additional defenses and counterclaims against Republic. Moreover, because the affirmative defenses raised by Hales in his initial answer put Republic on general notice of the basic contentions Hales now makes in his proposed amended answer—that Republic took advantage of Hales, that Hales was not fully aware of the consequences of signing the agreements at issue, that Republic breached its fiduciary duty to Hales, that Republic should have known that Hales was not represented by counsel and etc.—it cannot be said that Republic would be prejudiced by such amendment. Allowing Hales to raise these new claims against Republic will not unduly delay resolution of this lawsuit, and will not require additional discovery.

■ Amendment, insofar as Hales' additional defenses and counterclaims against Republic are concerned, shall therefore be permitted. The amended answer, however, and Hales' myriad counterclaims against Republic, are appropriately considered under the same summary judgment standard applicable to Republic's pending Rule 56 motion. After all, Hales has had ample opportunity for discovery, the parties agreed upon an extended and concurrent briefing schedule for their respective motions, and Hales was well aware of the necessity of marshaling admissible evidence in opposition to Republic's summary judgment motion. Hales has thus had a fair opportunity to garner all relevant evidence in his favor, and has not been denied an opportunity to present all material made pertinent to a Rule 56 motion.[7]

■ A parallel inquiry applies to Hales' proposed claims against the CPS Defendants. However, while Rule 15 would unquestionably apply to such amendments

7. In his papers, Hales has suggested that outstanding discovery disputes have prevented him from obtaining certain evidence. How-

ever, as shall be explained below, *infra* at 39–40, the time for resolution of discovery squabbles has long since passed.

as well, these amendments seek to join additional parties. Rule 15 must therefore be read in light of other provisions of the Federal Rules. Rule 20, for example, permits joinder of persons from whom relief is sought "in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any questions of law or fact common to all defendants will arise in the action." Rules 13 and 14 also govern the joinder of parties.[8]

For the purposes of the instant motion, however, the basic analysis set forth above concerning Rule 15 applies, as courts have read the joinder and impleader rules to require many of the same preconditions to amendment. *See Hines*, 1999 WL 440616, at *2 ("'Leave [to assert third-party claims] should be granted when, after considering the delay by the movant, the complication of the trial, and the merits of the proposed third-party complaint, the court concludes that the benefits of consolidation outweigh the prejudice to plaintiff and third-party defendants.'"); *Midlantic Commercial Co. v. Prime Sportswear Corp.*, No. 95 CIV. 10192(SWK), 1996 WL

361539, at *5 (S.D.N.Y. June 27, 1996) (granting motion to join non-parties as defendants pursuant to Rules 13(h) and 20(a), and noting that "adjudication of these claims will not cause a significant delay in proceeding with [plaintiff's] claims"); *Novak v. TRW, Inc.*, 822 F.Supp. 963, 973 (E.D.N.Y.1993) (finding joinder under Rule 20(a) to be appropriate given that it would not "delay the proceedings or prejudice plaintiff").

However, unlike the proposed amendments involving Republic, Hales' new claims against the CPS Defendants are problematic, and will both unduly prejudice Republic and unjustifiably delay resolution of the instant action. While Hales' counterclaims against Republic do not demand additional discovery, and will not inappropriately delay resolution of the instant action, the same cannot be said for Hales' claims against the CPS Defendants.

While Hales' proposed claims against the CPS Defendants arise out of the same underlying financial transactions as the instant action, both the relationship between CPS and Hales and the nature of the

---

**8.** Hales' claims against the CPS Defendants are not covered by Rule 14, which allows a third-party complaint to be served upon a non-party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claims against the third-party plaintiff," but rather are parallel claims for fraud, breach of fiduciary duty, and the like that are not at all dependant upon Hales' ultimate liability to Republic under the July Note or the July Swap. *See Hines v. Citibank, N.A.*, No. 96 CIV. 2565(RJW), 1999 WL 440616, at *3 (S.D.N.Y. June 28, 1999); *Telecom Int'l America, Ltd. v. AT&T*, No. 96 Civ. 1366(AKH), 1999 WL 777954, at *5 (S.D.N.Y. Sept.30, 1999); *Empire of America Fed. Sav. Bank v. Jacobson*, No. 85 Civ. 5781(RWS), 1986 WL 980, at *2–3 (S.D.N.Y. Jan. 15, 1986). Consequently, impleader of the CPS Defendants as traditional third-party defendants pursuant to Rule 14 would be inappropriate. Hales' labeling of the CPS Defendants as "counterclaim defendants," rather than "third-party defendants," appears to recognize this.

The CPS Defendants' entry into this action would therefore appear to be premised upon Rule 13(h)—which provides that "[p]ersons other than those made parties to the original

action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rule 19 and 20." Under Rule 13(h), parties may be properly joined as counterclaim defendants only where "at least one party against whom a counterclaim/third-party claim is asserted was a party to the original action." *Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F.Supp. 459, 470 (E.D.Mich.1995) (quoting *F.D.I.C. v. Bathgate*, 27 F.3d 850, 873–74 (3d Cir.1994); *c.f. Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 806 (2d Cir.1979)) ("If Empire's claims had been asserted solely against Goldberg and Aschkenasy as new parties, Rule 14 would apply and the claims would be third-party claims; however, as Empire's claims are directed against codefendant Sitomer as well as additional defendants Goldberg and Ashkenasy, they fall squarely within the joinder provisions of Rule 13(h) regarding the addition of parties to a cross-claim."). A defendant's ability to bring in non-parties under this rule has its limits, and "a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party." *Id.*

claims brought by Hales against the CPS Defendants are distinct from the relationship between Hales and Republic, and the counterclaims brought by Hales against Republic. Though Hales' proposed amended answer seeks to blur such distinctions, and though Hales asserts a number of counterclaims simultaneously against both Republic and CPS, the fact remains that allowing Hales to add the CPS Defendants as counterclaim defendants would engraft what is essentially a distinct, nascent action between Hales and the CPS Defendants concerning the parameters of their advisory relationship onto a soon-to-be-resolved action between a lending institution and a debtor. Additional discovery and motion practice will no doubt be required. As will be explained in more detail below, Republic's motion for summary judgment is granted, and Hales' counterclaims against Republic dismissed. To allow the joinder of the CPS Defendants would thus significantly, and impermissibly, delay the resolution of this action and prejudice Republic. *See Krumme v. Westpoint Stevens Inc.*, 143 F.3d 71, 81 (2d Cir.) (affirming district court's refusal to allow amendment on the grounds that delay was without excuse and proposed amendments "would require a new wave of discovery and would substantially delay the resolution of this action") (*quoting Krumme v. West Point–Pepperell, Inc.*, No. 89 Civ.2016(SAS), 1996 WL 257633, at *1 (S.D.N.Y. May 15, 1996)), *cert. denied,* —— U.S. ——, 119 S.Ct. 592, 142 L.Ed.2d 534 (1998); *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 112 F.R.D. 417, 419–21 (S.D.N.Y. Oct.23, 1986) (refusing to allow joinder of nonparty as defendant given that case was " 'on the eve of resolution,' " and noting that "[o]ne of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action") (*quoting L.D. Schreiber Cheese Co. v. Clearfield Cheese Co.*, 495 F.Supp. 313, 316 (W.D.Pa.1980)); *c.f. Fashion–in–Prints, Inc., v. Salon, Marrow & Dyckman L.L.P.*, No. 97 Civ. 0340(DC), 1999 WL 500149, at *7 (S.D.N.Y. July 15, 1999) (denying defendant's motion to implead nonparty, in part due to the delay caused by the reopening of discovery and motion practice); *Greyfin Corp. v. Galin*, 642 F.Supp. 1069, 1072 (S.D.N.Y.1986) (denying defendant's motion to add third-party defendant, in part because "the summary judgment in this action ends the suit between the plaintiff and the defendant," and "[t]o allow the defendant to add [proposed third-party defendant] Templar as a party would unjustifiably delay judgment on this action and prejudice the plaintiff").

Though the Court is well aware of both the liberal nature in which Rule 15 is to be interpreted and the permissiveness of the Federal Rules' joinder provisions, the addition of the CPS Defendants as counterclaim defendants at this stage in the litigation would not be appropriate. Should Hales wish, it is well within his power to initiate a new action against the CPS Defendants, and to use any of the discovery material gathered during this action in aid of his claims. *See H.L. Hayden*, 112 F.R.D. at 423.

### 2. *Summary Judgment in Favor of Republic is Appropriate*

Summary judgment is appropriate only where the evidence is such that a reasonable jury could not return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(c), Fed.R.Civ.P., it shall be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Second Circuit has explained:

"As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the

nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim. *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991) (*quoting Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988)) (internal citations omitted). A party seeking to defeat a motion for summary judgment cannot "rely on mere speculation or conjecture as to the true nature of facts" to overcome the motion. *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986)). Moreover, a defendant's "bald assertion[s], completely unsupported by evidence," are insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995).

Based on the reasoning that follows below, there are no material factual issues in dispute concerning Republic's claim against Hales, or concerning Hales' various counterclaims against Republic. The documentation of the transactions at issue is complete, and the meaning of the July agreements, as memorialized, is not seriously disputed. The critical elements of the fraud and other defenses which Hales has alleged, and upon which he has relied to vitiate the transactions at issue, have not been established. Therefore, summary judgment in this diversity action is appropriate.

### A. *Hales Has Not Challenged the Documentation of the Transactions*

Hales has not challenged Republic's interpretation of the written terms of the July Agreements, its claim of default on the part of Hales, or its calculation of damages. Hales has also not challenged

Republic's claimed entitlement to reasonable expenses and attorneys' fees under the terms of the July Agreements. His opposition is based, in essence, upon what he has characterized as Republic's "massive fraud."

More specifically, Hales has alleged, *inter alia,* that (1) Republic was aware, as of the June and July Agreements, that Hales had retained CPS as his financial advisor, and that both Republic and CPS conspired to take advantage of Hales; (2) that Republic fraudulently withheld information from Hales concerning a "fee splitting" arrangement it had with CPS, as well as concerning an agreement with CPS to increase charges to Hales under the terms of the contemplated agreements; (3) that Republic repeatedly misrepresented the true mechanics of the June and July Put transactions, and that he was informed that the exercise of his put would guarantee him fifty percent of the value of his stock as of the effective date of the puts at issue; (4) that he only agreed to borrow large sums from Republic because he was improperly led to believe that the puts functioned in such a way as would guarantee payment of the outstanding loans by virtue of the put proceeds, and that he is not properly considered in default under the July Note given that the amount owed to him under the July Put should have been used to offset any amounts due under that note; (5) that he was faxed the relevant agreements late in the evening before settlement, the implication being that he did not have an adequate opportunity to review the terms of the agreements he signed;[9] (6) that Republic never sent the ISDA Definitions to him or informed him about those definitions, and that those definitions were therefore totally unknown to him at the time he entered into the relevant agreements; (7) that Republic was aware that Hales was not represented by counsel, that Hales was not experienced with respect to derivative transactions of the type memorialized, and that Hales was therefore relying on Republic's good faith

---

9. In his papers, Hales states that he was "pressured to sign at the last minute."

and fair dealing in entering into the transactions; and (8) that despite Republic's awareness of Hales' concerns regarding the short-selling of TXCO stock, Republic nevertheless short-sold TXCO on June 4, 1997 and on other-occasions.

As the discussion below will hopefully indicate, Hales' defenses and counterclaims are either wholly without merit or are unsupported by admissible evidence, and summary judgment is appropriately granted in favor of Republic.

### B. *Hales Has Not Established Any Valid Defenses to Enforcement of the July Agreements, and Has Failed to Withstand Summary Judgment as to His Counterclaims Against Republic*

While the June Agreements and July Agreements differ in a few of their specific terms, the essential structure of the transactions entered into by Hales remained the same. The terms of the July Put provided for a payment dependant upon the difference between the per-share price of TXCO as of December 4, 1997 and the strike price of $3.00.

■ According to Hales, however, the put transaction he believed he was signing allowed him a guaranteed option to sell his TXCO stock to Republic at $3.00 per share on December 4, 1997, and that this meant that the loan he had obtained from Republic would be guaranteed of payment from the proceeds of the put. In essence, Hales' position is that the put transaction he agreed to enter was one in which "physical" settlement was to apply. Hales points to various telephone conversations, recorded by Republic and far less amendable to a damning interpretation than Hales suggests, to support his position, and asserts in an affidavit that he "clearly understood that the PUT Option guaranteed me that on the due date of my loan, I could exercise my PUT Option and receive 50% of the value of my stock, and that these funds

could be used to offset any indebtedness then outstanding." Hales further submits that "[a]t the time of [his] dealings with Republic [he] was not experienced in the extremely complicated type of derivatives trading involved in the transactions proposed by Republic," and that his understanding of the term "cash settlement" was not inconsistent with that understanding. Hales has also alleged that Republic failed to advise him properly in a number of respects, such as concerning the potential riskiness of the transactions in which he was entering and the desirability of those transactions given his financial needs, and that Republic took advantage of Hales in "entering into the subject transactions when [it] knew or should have known that Hales was not represented by and did not have legal counsel to advise him of the legal import and effect of the complex, interwoven and wholly unsuitable derivatives transactions he was being lured into by Republic and its co-conspirators."

While Hales has made efforts to pass himself off as a "babe in the woods" who was taken advantage of by an unscrupulous banking institution possessed of superior information and resources, he nevertheless represented himself to Republic as a sophisticated businessman. Indeed, the very transcripts offered by Hales in connection with the instant motion reveal that Hales represented himself as having significant experience with swaps and options, and make rather clear Hales' own favorable assessment of his business acumen. He is neither a widow nor an orphan, however, and his efforts to avoid his contractual obligations by playing the fool are not well taken.

■ Hales' insistence that he was not afforded a sufficient opportunity to review the documents he signed is similarly unpersuasive. First, whether or not a party to an agreement has actually read and understood all portions of an agreement, the law [10] generally assumes that he

**10.** New York law has been applied given the choice-of-law provisions contained within the June and July Agreements.

has. *See Sotheby's, Inc. v. Dumba,* No. 90 Civ. 6458(KMW), 1992 WL 27043, at *6 (S.D.N.Y. Jan.31, 1992). Were it otherwise so, then any party to a contract could easily avoid his or her solemn obligations. Assuming that Hales was unable to review carefully the terms of the documents he signed, then it was incumbent upon him to either secure additional time in which to review those documents, or to refuse to sign. Similarly, that Hales purportedly did not have a lawyer review the precise terms of the agreements would not allow Hales to avoid his obligations. *See Dumba,* 1992 WL 27043, at *3. Hales' failure to scrutinize [11] the contractual provisions he was signing are his fault and his fault alone. *See Pimpinello v. Swift & Co.,* 253 N.Y. 159, 162–63, 170 N.E. 530, 531 (1930) ("If the signer read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); *Generale Bank v. Wassel,* No. 91 Civ. 1768(LAP), 1995 WL 312466, at *4 (S.D.N.Y. May 19, 1995) ("[I]t is no excuse that Wassel did not read the documents before signing them. New York law has long been clear that a party who fails to read a document before executing it cannot later complain about a misunderstanding of the contents.").

Second, while Hales has asserted, both in his amended answer and in an affidavit submitted to this Court, that he was not afforded an ample opportunity to review the terms of the agreements he signed, undisputed portions of the record demonstrate that such was emphatically not the case. Indeed, because the agreements upon which Republic has sued were signed in July of 1997, and those agreements were all but identical to those Hales had signed in June of 1997, Hales had more than a month in which to evaluate whether their basic terms met his approval. Moreover, while Hales has stated that Republic was aware he was not represented by counsel in connection with the agreements at issue, and his papers in connection with the instant motions emphasize that Jones, Day's involvement was limited to the issuance of the 144 Opinion, Jones, Day documents submitted by Republic demonstrate that drafts of the relevant documentation were in fact sent to Grewal on May 20, 1997. One facsimile, enclosing a draft Master Agreement, swap confirmation, and put confirmation, is even addressed to "John Hales c/o Shiv Grewel," and asks Grewal to "[k]indly review the documents and contact me if you have any comments or questions." Under such circumstances, Hales can hardly be heard to complain that he was not afforded an adequate opportunity to review—or have Grewel review—the transaction documents. Grewel's failure to forward the drafts to Hales, or any refusal by Hales to retain his attorney's services in reviewing the substance of the agreements he intended to sign, are oversights for which Republic is not responsible.[12]

Particularly unpersuasive is Hales' assertion that he should not be held to the terms of the July Put, as the ISDA Definitions incorporated therein were not sent to him by Republic. Not only was the language incorporating those definitions

---

**11.** In his deposition testimony, Hales explains the manner in which he reviewed the documents he signed:

Q. When you received the 80 or so pages by fax, did you read them?

A. I didn't read every word. I read what I saw were the main things, the strike price, the number of shares, the amount of loan, the interest rate, the principal things that Jay [Nadelson] had advised me earlier on in the day, and those were the same. I signed the documents and sent them back.

(Tr. at 245.)

**12.** Though not essential to the Court's resolution of this issue, it is nevertheless interesting to note the following May 16, 1999 exchange between Nadelson and Hales—as set forth in the transcripts submitted by Hales.

Hales: I mean if I have all the documents, I will let you have all the amendments on Monday.

Nadelson: I mean this stuff is going to have to go to your lawyers you know. It's going to be how fast they can turn it around.

Hales: Shiv will work for me any hour of the day or night.

clear, and the incorporation of the ISDA Definitions by reference standard in derivatives transactions,[13] but the record reveals that the same fax sent to Grewal enclosing a draft of the put and swap confirmations stated that "if you need any background documents (such as the 1991 or 1996 ISDA Definitions) please feel free to call." Not surprisingly, Hales makes no reference to this correspondence in his papers.

■ Under New York law, therefore, Hales cannot avoid his obligations under the July Agreements. Furthermore, no triable issues exist as to whether Hales acted in "reasonable reliance" upon any of the myriad representations and omissions he has attributed to Republic. Because reasonable reliance is a necessary element of his common law fraud and misrepresentation claims, as well as his claim brought against Republic pursuant to Rule 10b–5, *see International Motor Sports Group v. Gordon,* No. 98 CIV 5611(MBM), 1999 WL 619633, at *6 (S.D.N.Y. Aug.16, 1999), such claims cannot withstand a motion for summary judgment.

■ First, even assuming that Republic misrepresented the nature of the transactions in which Hales was entering—itself an open question given the parties' submissions on this subject—reasonable reliance is belied by the specific terms of the agreements. For example, Hales' suggestion that he was led to believe that he could "put" his TXCO shares to Republic on December 4, 1997 at an agreed-upon price, and that the loan could therefore be paid out of that guaranteed sale amount, are directly contradicted by the precise terms of the June and July Puts. Under New York law, reasonable reliance is precluded when " 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.' " *Villa Marin Chevrolet v. General Motors Corp.,* No. 98–CV–6167 (JG), 1999 WL 1052494, at *5 (E.D.N.Y. Nov.18, 1999) (*quoting M.H. Segan L.P. v. Hasbro, Inc.,*

924 F.Supp. 512, 527 (S.D.N.Y.1996)); *c.f. Bonacci v. Lone Star Int'l Energy, Inc.,* No. 98 CIV. 0634 HB, 1999 WL 76942, at *2 (S.D.N.Y. Feb.16, 1999) ("In limited circumstances, reliance may be unreasonable as a matter of law where the alleged misrepresentations are explicitly contradicted by investment documents.").

Any reliance by Hales, a sophisticated businessman, upon representations contrary to the plain language of the agreements he was signing would therefore be patently unreasonable. *See Insurance Co. of North America v. Hoffman,* No. 89 Civ. 4896(LMM), 1991 WL 3236, at *1 (S.D.N.Y. Jan. 10, 1991) (finding defendant debtor's reliance on allegedly fraudulent representations concerning content of promissory note and pledge agreement to be unjustifiable as matter of law); *Dumba,* 1992 WL 27043, at *6 ("Courts in our jurisdiction have repeatedly refused to accept the defense that an agreement should be invalidated merely because one party induced the other to sign the document by falsely stating that it had no legal effect. The rationale of these cases is that a party signing a document is bound by his or her signature, and may not rely on an oral representation that there is no contract when the face of the document would indicate otherwise."); *600 W. 115th St. Corp. v. 600 W. 115th St. Condominium,* 180 A.D.2d 598, 599, 580 N.Y.S.2d 307, 308 (1st Dep't 1992) (holding that "any claim of justifiable reliance by plaintiff is dispelled by the plain language of plaintiff's lease"); *Norstar Bank of Upstate, N.Y. v. Office Control Sys., Inc.,* 165 A.D.2d 265, 268, 566 N.Y.S.2d 743, 745 (3d Dep't 1991) (finding that "where . . . defendant is neither uneducated nor unable to read and he could have ascertained the true nature of the document by reading it" defense of fraud in factum or fraudulent inducement is unavailable), *appeal dismissed,* 78 N.Y.2d 1110, 578 N.Y.S.2d 868, 586 N.E.2d 51 (1991); *Humble Oil & Refining Co. v.*

---

**13.** In fact, the very language Hales questions appears in a sample confirming agreement provided as an exhibit to the ISDA Definitions. *See* ISA Definitions, at 33.

*Jaybert Esso Serv. Station, Inc.*, 30 A.D.2d 952, 952, 294 N.Y.S.2d 190, 192 (1st Dep't 1968) ("We find it incredible that this sophisticated businessman relied on the alleged misrepresentations. Since the written instrument contains terms different from those allegedly orally represented, and Bloch is presumed to have read the writing, he may not claim he relied on the representations").

Second, in addition to signing general merger clauses as part of the agreements he signed, Hales specifically disclaimed having relied upon Republic for investment advice or for an evaluation of the terms of the agreements he was entering. The Master Agreement, which applied to both the June Swap and June Put, stated as follows:

> **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):
>
> (a) **Non-reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying upon any communication (written or oral) of the other party as investment advice or a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assur-

ance or guarantee as to the expected results of that Transaction.

> .    .    .    .    .
>
> (b) **Evaluation and Understanding.** It is capable of evaluating and understanding (on its own behalf or through independent professional advice) and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.
>
> (c) **Status of Parties.** The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

Master Agreement, at 26.[14]

In signing the July Loan Agreement, Hales also specifically agreed that, except as otherwise provided by the July Agreements, "each payment by Counterparty [Hales] hereunder or under the Note shall be made without set-off or counterclaim." July Loan Agreement § 2.04. Unlike a generic "merger" clause standing alone, the waivers signed by Hales were sufficiently particular so as to preclude Hales' present challenge to any statements for which reliance was specifically disclaimed, and to bar Hales' claim for a set-off against the amount owed under the terms of the July Loan Agreement. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir.1995); *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 61 (S.D.N.Y.1996); *Wassel*, 1995 WL 312466, at *4; *Fortunoff v. Triad Land Associates*, 906 F.Supp. 107, 118–20 (E.D.N.Y.1995).

Third, to the extent that Hales' claims depend upon fiduciary duties owed by Republic to Hales, Hales has failed to offer any evidence that could establish the existence of any such duties. It is well settled under New York law that the usual relationship of a bank and its customer is

---

**14.** The July Margin Agreement also contains a clause explicitly disclaiming reliance by Hales upon Republic, which states that "[c]ounterparty has, independently and without reliance upon Republic and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement." July Margin Agreement, at 5.

not a fiduciary one, but rather one of creditor and debtor. *See Banque Arabe,* 57 F.3d at 158; *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 122 (2d Cir.1984). Nothing in the arms-length relationship between Hales and Republic would justify a departure from this rule. A review of the record does not reveal any failures on Republic's part to disclose information to Hales that it was obligated to reveal by virtue of their arms-length relationship.[15]

■■■■ Hales' protestations to the contrary notwithstanding, none of the information Republic allegedly omitted to provide Hales was within Republic's obligation to provide. While under New York law it is the case that an affirmative duty to disclose material information may arise, in the absence of a fiduciary duty or need to clarify an ambiguous statement, where a party has superior information, that information is not readily available to the other party, and the first party knows that the second party is acting on the basis of mistaken knowledge, *see Banque Arabe,* 57 F.3d at 155, the authorities are rather clear that an action for fraud may not lie in New York where the complaining party had access to the information at issue. *See Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989) ("Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable."); *International Motor Sports,* 1999 WL 619633, at *7 (" 'Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access,' courts are 'par-

ticularly disinclined to entertain claims of justifiable reliance.' ") (*quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984)). The same is the case with fraud claims brought under Section 10b–5. *See International Motor Sports,* 1999 WL 619633, at *7 (holding that under the federal securities laws " '[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." ') (*quoting Brown v. E.F. Hutton Group,* 991 F.2d 1020, 1032 (2d Cir.1993)). The actual terms of the July Agreements were certainly not facts uniquely within Republic's control, and there is no question but that the ISDA definitions were available for Hales or his counsel to review—had they so wished. Similarly, the risks and advantages to the package of transactions Hales entered with Republic could well have been evaluated by Hales himself, and Hales cannot now seek to avoid his obligations on the ground that Republic should have told him that he was engaging in a risky or unsuitable transaction.

■■■■ Moreover, insofar as Hales has claimed that Republic had an obligation to disclose that CPS was to be paid by Republic in connection with the June and July Puts, the put agreements themselves indicate that CPS was the "Broker/Arranger." Since Hales certainly would have been aware that he was not paying CPS broker/arranger fees, the disclosure of this information in the put agreement would hardly support the proposition that Republic's "superior knowledge" required disclosure. Additionally, to the extent that Hales asserts that Republic was well aware that CPS had been formally retained by Hales as his financial advisor, the record does not contain any evidence of such awareness as of the closing dates of the transactions at issue.[16]

15. The absence of a fiduciary relationship between Hales and Republic, it should be noted, also precludes any claim by Hales for negligent misrepresentation. *See Banque Arabe,* 57 F.3d at 158.

16. The first evidence from which any such awareness could be inferred appears in a December 2, 1997 conversation involving Lillaney and a Republic employee by the name of "Cahill." In that conversation, Lillaney de-

Finally, Hales' claims concerning Republic's short sales of TXCO cannot survive summary judgment. Hales has claimed that he was entitled to rely upon a "gentleman's" commitment by Nadelson that Republic would not sell TXCO stock short, contrary language of the July Margin Agreement notwithstanding, and that Republic violated that commitment. In support of this claim, Hales has asserted that Republic short-sold 500 shares of TXCO on June 4, 1997, and has submitted records from which he contends other short sales can be discerned. Hales also submits, in an affidavit, that he has "a good faith basis to believe ... that Republic used various affiliated entities to either short sell the stock or lend the stock out to others for the ostensible purpose of short selling, thus facilitating a downward spiral in the market price of TXCO stock." However, it is obvious from Hales' affidavit that his representations concerning Republic's alleged short selling are not made upon first-hand knowledge, and the affidavit is therefore little better than the pleadings that it attempts to bolster. *See* Fed. R.Civ.P. 56(e) ("Supporting affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

Hales has failed to demonstrate that any triable issue exists with respect to such short-sales. Insofar as any June 4 short sales are concerned, the obligations upon which Republic presently sues were signed in July of 1997, and the June Agreements terminated by consent of both of the parties. Thus, the pricing of both the July Swap and the July Put were determined according to the price of TXCO stock as of the date of the July confirmations, and not June 4. While TXCO closed at $5.4375 per share on June 4, the price of the stock had actually increased by the time the July Agreements were signed, and Hales had an opportunity to evaluate whether the

pricing of the July Swap and July Put was to his liking. To suggest that any sale on June 4 adversely impacted the terms of the agreements Hales signed in July is thus an exercise in futility.

To the extent that Hales also claims that Republic improperly engaged in short-selling of TXCO stock throughout the period in which Hales' loans were outstanding, the record does not contain sufficient evidence of such sales to survive summary judgment. While Hales has indicated that, with additional time and discovery, he will be able to provide such evidence, the time for discovery has come and gone. Any disputes concerning discovery, or non-production of requested documents, were to be brought to the attention of this Court either prior to the close of discovery or shortly thereafter. No timely applications for judicial intervention were made. Furthermore, an extended briefing schedule concerning the motions under consideration was agreed upon by the parties to this action—without any suggestion whatsoever by Hales that consideration of Republic's motion be postponed pending resolution of outstanding discovery disputes. Hales cannot now resist Republic's motion for summary judgment on the grounds that further discovery will reveal that he, in fact, has a claim.

The Court has considered Hales' other counterclaims in this action, and considers them unable to survive a motion for summary judgment. Furthermore, Hales' 11th-hour application concerning discovery shall be denied.

### Conclusions

For the reasons stated herein, the Court therefore grants Hales' motion to amend in part, denies that motion in part, and grants summary judgment in favor of Plaintiff Republic. Hales' motion to compel is denied. Those portions of Hales' amended answer, filed March 4, 1999, that raise claims against the CPS Defendants

---

scribes himself as Hales' "advisor." However, this conversation comes well after the

signing of the July Agreements.

shall be deemed stricken, and this matter shall be set down for a hearing at the parties' convenience concerning expenses and attorney's fees.

It is so ordered.